LEROY BONNER *et al.*, Plaintiffs-Appellees, *v.* WESTBOUND RECORDS, INC., *et al.*, Defendants-Appellants.—(JAMES WILLIAMS, Plaintiff.)

First District (3rd Division)   No. 77-542

Opinion filed September 5, 1979.

Norman J. Barry, Joseph P. Dalla Maria, Jr., and Dale W. Bruckner, all of Chicago (Rothschild, Barry & Myers, of counsel), for appellants.

Richard M. Shelton and Elliott Kalcheim, both of Chicago (Wallace, Shelton, Kleinman & Kalcheim, of counsel), for appellees.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

The defendants Westbound Records, Inc. (Westbound), and Bridgeport Music, Inc. (Bridgeport), appeal from a summary judgment in favor of the plaintiffs. The circuit court held that two contracts dated March 24, 1972, between the defendants and a rock music performing group known as The Ohio Players, of which the plaintiffs were members, were void and unenforceable.

Westbound's business is making master recordings and selling them to others for production and distribution. The agreement between Westbound and The Ohio Players (the recording agreement) required The Ohio Players to make records exclusively for Westbound for a 5-year period. Bridgeport is in the business of owning and licensing copyrights to music compositions. The agreement between Bridgeport and The Ohio Players (the publishing agreement) provided that Bridgeport would employ The Ohio Players as authors and arrangers so long as the recording agreement was in existence, and that The Ohio Players would render these services exclusively for Bridgeport. Both agreements provided they were to be governed by and construed in accordance with Michigan law. The capital stock of both Westbound and Bridgeport was owned by the same person.

In the 21 months immediately following the execution of the recording agreement, The Ohio Players recorded four single records and two albums for Westbound. They were successfully distributed on a national basis, and one of the records, FUNKY WORM, was the recipient of a gold record, which in the record industry symbolizes sales in excess of $1,000,000. During the months these recordings were being made, Westbound advanced $59,390 for costs of recording sessions for The Ohio Players, artwork, travel expenses, and recording session wages paid to The Ohio Players. In addition, Westbound and Bridgeport advanced $22,509 to enable The Ohio Players to pay income taxes they owed and to settle litigation against them. Neither of the defendants was obligated to make the latter advances. The Ohio Players had no personal obligation to repay these advances; under the recording agreement and the publishing agreement, Westbound and Bridgeport could recoup the advances they made only out of royalties payable to The Ohio Players.

In January 1974, five of The Ohio Players, the plaintiffs in this case, repudiated the recording agreement, and signed an agreement with Phonogram, Inc., and Unichappell (hereinafter collectively referred to as Mercury Records), competitors of Westbound, to record exclusively for

Mercury Records under the "Mercury" label. On March 8, 1974, they filed this action seeking a judgment declaring that the recording agreement was invalid and unenforceable, and that, consequently, they were no longer obligated to record for Westbound.

The defendants responded by filing a counterclaim. Thereafter, with leave of the circuit court, Westbound and Bridgeport filed a pleading in the action which they labeled a third-party complaint adding Mercury Records as third-party defendants. This pleading charged Mercury Records with tortious interference with the recording agreement by inducing The Ohio Players to breach their agreement with Westbound and to agree to record for Mercury Records instead. As in the case of the action of The Ohio Players seeking a declaratory judgment, the third-party complaint against Mercury Records raised the issue of the validity and enforceability of the recording agreement. Following the entry of summary judgment in favor of the plaintiffs in the declaratory judgment action, the circuit court entered summary judgment in favor of Mercury Records in the tortious interference action. The reason the circuit court judge gave for this summary judgment was that, because he had already determined the recording agreement and the publishing agreement were void and unenforceable, there was no contract in existence which Mercury Records could have caused The Ohio Players to breach. Westbound and Bridgeport have appealed that summary judgment to this court in a separate appeal also decided today (*Westbound Records, Inc. v. Phonogram, Inc.* (1979), 76 Ill. App. 3d 359, ___ N.E.2d ___). We refer to *Westbound Records* in this opinion not only because it is related to this appeal, but also because of its relevance to the first issue to be decided in this case—the contention of Westbound and Bridgeport that Illinois courts have no jurisdiction over them.

The defendants, both Michigan corporations with their principal offices in Detroit, were served in Michigan pursuant to the Illinois long-arm statute (Ill. Rev. Stat. 1973, ch. 110, par. 16). Both defendants maintain that they have never transacted business in Illinois, and consequently were not amenable to long-arm service.

The plaintiffs contend that not only was long-arm service valid, but that Westbound submitted to the jurisdiction of Illinois courts by filing its counterclaim as well as by filing the tortious interference action against Mercury Records. Westbound, on the other hand, argues that it never voluntarily submitted to the jurisdiction of Illinois courts. It asserts that it was compelled to file its counterclaim so as not to be barred from asserting it in a subsequent action. Westbound also contends that it was forced to file its complaint against Mercury Records in Illinois because any decision in The Ohio Players' declaratory judgment action that the recording agreement was void or unenforceable could have subjected

Westbound to the bar of a *res judicata* or collateral estoppel plea in any suit it might institute against Mercury Records in another forum.

■■ Westbound filed its action against Mercury Records in Illinois solely as a matter of convenience and tactics. Because a defense motion for summary judgment against Westbound was granted, Westbound's suit against Mercury Records is not subject to voluntary dismissal except on terms fixed by the court. (Ill. Rev. Stat. 1977, ch. 110, par. 52; *City of Palos Heights v. Village of Worth* (1975), 29 Ill. App. 3d 746, 331 N.E.2d 190.) In view of the difficulty it would have in finding a jurisdiction with a statute of limitations long enough to accommodate an action for tortious interference more than 5 years after it took place, it is unlikely that Westbound would now choose to voluntarily dismiss its action against Mercury Records in Illinois so as to bring it elsewhere, even if that privilege were open to it. And, although any decision we reach in Westbound's action against Mercury Records regarding the validity of the recording agreement might be binding as an estoppel against Westbound in any action instituted by The Ohio Players in another jurisdiction, it would not operate as an estoppel against the performers. Thus, accepting Westbound's contention that this appeal should be dismissed for lack of jurisdiction over it, while at the same time proceeding to decide the tortious interference action which Westbound chose to file here, might lead to the impractical and undesirable result of contradictory holdings between this court and that of another State in which The Ohio Players might seek to determine the validity of the recording agreement.

■■ Inasmuch as, in its action against Mercury Records, Westbound has invoked the jurisdiction of an Illinois court to determine the validity and enforceability of the recording agreement, it cannot question the propriety of an Illinois court deciding precisely the same issue in this action. Expediency, common sense, and the conservation of judicial time and effort, as well as the desirability of having the validity of the recording agreement decided the same way in both actions, lead to this conclusion. By choosing Illinois for its action against Mercury Records, Westbound subjected itself to the jurisdiction of our courts in other actions involving issues identical with those raised in the action Westbound has elected to file here.

Proceeding to the merits, the plaintiffs contend that the recording agreement is unenforceable because no consideration passed from Westbound to The Ohio Players for their agreement to record exclusively for Westbound. Plaintiffs emphasize especially that the recording agreement lacked mutuality because even though The Ohio Players were obligated to make a minimum number of recordings, Westbound was not required to make even a single recording using The Ohio Players. An additional argument advanced by the plaintiffs is that the recording

agreement was never effective because it was never submitted to the Board of The American Federation of Musicians for approval as required by the rules and regulations of that union. The plaintiffs also suggest that the exclusive service provision of the agreements violates a Michigan statute (Mich. Comp. Laws Ann. §445.761 (1967)) prohibiting restraints of trade and for that reason the agreements are illegal as against public policy.

■■■ Contrary to the conclusion reached by the circuit court judge, it is our view that consideration passed to The Ohio Players when they accepted $4,000 to enter into the agreements. The fact that this payment was made by Westbound and Bridgeport by a check containing the notation that it was "an advance against royalties" does not disqualify the payment from being regarded as consideration. If sufficient royalties were not earned to repay Westbound the $4,000, The Ohio Players would not have been obligated to return it. By making the $4,000 advance, Westbound suffered a legal detriment and The Ohio Players received a legal advantage. (See *Central National Bank & Trust Co. v. Consumers Construction Co.* (1972), 5 Ill. App. 3d 274, 279, 282 N.E.2d 158.) Therefore, under both Michigan and Illinois law, the $4,000 payment constituted valid consideration. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 371 N.E.2d 634; *City of Highland Park v. Grant-Mackenzie Co.* (1962), 366 Mich. 430, 115 N.W.2d 270; *Nathan v. Leopold* (1969), 108 Ill. App. 2d 160, 247 N.E.2d 4.) It is not the function of either the circuit court or this court to review the amount of the consideration which passed to decide whether either party made a bad bargain (*Harris v. Chain Store Realty Bond & Mortgage Corp.* (1950), 329 Mich. 136, 145, 45 N.W.2d 5, 9; *Levitz v. Capitol Savings & Loan Co.* (1934), 267 Mich. 92, 255 N.W. 166; *Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 338, 356 N.E.2d 67; 1 Williston, Contracts §115 (3d ed. 1957)) unless the amount is so grossly inadequate as to shock the conscience of the court. (*Rose v. Lurvey* (1972), 40 Mich. App. 230, 198 N.W.2d 839. But see *Harris.*) The advance The Ohio Players received, taken together with their expectation of what Westbound would accomplish in their behalf, does not shock our conscience. On the contrary, to a performing group which had never been successful in making records, Westbound offered an attractive proposal. The adequacy of consideration must be determined as of the time a contract is agreed upon, not from the hindsight of how the parties fare under it. *Crail v. Blakely* (1973), 8 Cal. 3d 744, 505 P.2d 1027, 106 Cal. Rptr. 187.

Although the $4,000 payment to plaintiffs was not recited in either of the agreements, parol evidence was properly admitted to establish that the payment was made in consideration of the agreements. Where a contract is silent as to consideration, its existence may be established

through parol evidence. (1 Williston, Contracts §115B, at 471 (3d ed. 1957); *Edoff v. Hecht* (1935), 270 Mich. 689, 260 N.W. 93; *Michalowski v. Richter Spring Corp.* (1969), 112 Ill. App. 2d 451, 251 N.E.2d 299.) The agreements are valid and enforceable even if they lack mutuality because they are supported by the executed consideration of $4,000 passing from the defendants to The Ohio Players. *Consolidated Laboratories, Inc. v. Shandon Scientific Co.* (7th Cir. 1969), 413 F.2d 208; *Robey v. Sun Record Co.* (5th Cir. 1957), 242 F.2d 684.

■■ Even had the defendants not made the $4,000 advance, the plaintiffs could not prevail. The circuit court judge erred in finding that "there was no obligation on the part of the defendants to do anything under their respective agreements" with The Ohio Players. During the first 21 months after the date of the recording agreement, Westbound expended in excess of $80,000 to promote The Ohio Players and to pay their taxes and compromise litigation against them, and during this period the performers recorded four single records and two albums. The consistent pattern of good faith best efforts exerted by the parties during the first third of the term of the agreements demonstrates that they intended to be bound and to bind each other. Even contracts which are defective due to a lack of mutuality at inception may be cured by performance in conformance therewith. *Adkisson v. Ozment* (1977), 55 Ill. App. 3d 108, 110, 370 N.E.2d 594.

■■ Disregarding the performance under the agreements, the conclusion that the parties intended to be and were mutually obligated is also compelled by the rule that the law implies mutual promises to use good faith in interpreting an agreement and good faith and fair dealing in carrying out its purposes. (*Mueller v. Bethesda Mineral Spring Co.* (1891), 88 Mich. 390, 50 N.W. 319; *Michigan Stone & Supply Co. v. Harris* (6th Cir. 1897), 81 F. 928; *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 286, 154 N.E.2d 683; *Wood v. Lucy, Lady Duff-Gordon* (1917), 222 N.Y. 88, 118 N.E. 214.) In *Wood v. Lucy*, an often-cited decision, the plaintiff, a dress manufacturer, obtained exclusive rights to market dresses designed by the defendant, a prominent designer, in return for the plaintiff's agreement to pay the designer one-half of its profits. The designer endorsed fabrics and dresses of plaintiff's competitors, and defended the plaintiff's suit for damages by contending, as the plaintiffs in this case argue, that the contract lacked mutuality because it did not require the plaintiff to do anything. Mr. Justice Cardozo, speaking for the New York Court of Appeals, rejected this argument, saying:

> "[The defendant insists] that the plaintiff does not bind himself to anything. *It is true that he does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a*

*promise is fairly to be implied.* The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed. [Citations.] If that is so, there is a contract." 222 N.Y. 88, 90-91, 118 N.E. 214. (Emphasis added.)

Justice Cardozo relied upon features identical with those included in the recording agreement as a basis for implying that the manufacturer had a contractual obligation. Referring to the manufacturer's exclusive privilege to market the designer's creations, the court reasoned that absent the manufacturer's efforts, the designer would have had no right to market her own fashions. Justice Cardozo explained the significance of this factor:

"We are not to suppose that one party was to be placed at the mercy of the other." 222 N.Y. 88, 91, 118 N.E. 214.

The court noted that it was to be assumed that the plaintiff's business organization would be used for the purpose for which it was adapted, to manufacture and distribute the designer's creations. The court also regarded as relevant that the designer's compensation depended upon the manufacturer's efforts. The court next stressed the duty of the manufacturer to account for profits, commenting that this obligation supported the conclusion that the manufacturer had an obligation to use reasonable efforts to bring profits and revenues into existence.

The doctrine announced in *Wood v. Lucy* is the law of Illinois. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683; *Cook-Master, Inc. v. Nicro Steel Products, Inc.* (1950), 339 Ill. App. 519, 90 N.E.2d 657.) It also appears to have been the law in Michigan even prior to *Wood v. Lucy* (*Mueller v. Bethesda Mineral Spring Co.* (1891), 88 Mich. 390, 50 N.W. 319, relied on in *Lucy*; *Michigan Stone & Supply Co. v. Harris* (6th Cir. 1897), 81 F. 928), and has been adopted by many other States.

Courts in Illinois have consistently required contracting parties to use their best efforts to effectuate the intent of the parties. In *Dasenbrock v. Interstate Restaurant Corp.* (1972), 7 Ill. App. 3d 295, 287 N.E.2d 151, a lease conditioned the obligation to pay rent upon the tenant obtaining certain licenses and permits for the premises. The tenant justified his nonpayment of rent by his failure to obtain the required permits and licenses. The court held that the lease contained an implied promise by the tenant to act in good faith and use reasonable efforts to obtain such licenses and permits within a reasonable time. The court went on to hold that the tenant's failure to make any effort to obtain such permits over a 2-year period while paying no rent was a breach of the lease which

rendered him liable for all of the accrued rent. And in *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683, the court said:

> "Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." 15 Ill. 2d 272, 286.

The plaintiffs attempt to distinguish *Wood v. Lucy* in three ways. First, they contend that the agreements in this case resulted in the transfer of their total creative efforts, while the designer in *Wood v. Lucy* transferred only limited rights. The reverse is true. The designer transferred not only endorsement rights, but the exclusive right to sell her designs and to license others to sell them. In other words, she transferred the identity of her creative efforts and her major source of livelihood as a dress designer. In this case, The Ohio Players retained the right to perform in nightclubs and in concerts. This is significant, for at the time these agreements were signed, the major portion of The Ohio Players' income was from their live performances rather than their recording or song-writing efforts.

Next, the plaintiffs contend that the recording agreement is assignable and that an assignable contract is not subject to an implied promise of good faith. This distinction is not persuasive for the manufacturer in *Wood v. Lucy* had the exclusive right to sell or to license others to sell the designer's creations (222 N.Y. 88, 90, 118 N.E. 214), which in effect meant that his contract rights were assignable.

Finally, plaintiffs, relying upon provisions of the recording agreement and the publishing agreement, argue that those agreements expressly negated any implied promise by defendants to perform in good faith, and *Wood v. Lucy* is, therefore, not applicable. The recording agreement provided:

> "Company is not obligated to make or sell records manufactured from the master recordings made hereunder or to license such master recordings or to have Artist record the minimum [number] of record sides referred to in Paragraph 2 (B)."

The publishing agreement provided:

> "The extent of exploitation of any Musical Composition, including the publication of sheet music or other printed editions, or the decision to refrain therefrom, shall be entirely within the discretion of Publisher."

■■ Plaintiffs' argument is inconsistent with the meaning of the agreements, taken in their entirety, and also is at odds with the interpretation placed upon the agreements by the parties. Neither of the above-

quoted provisions states that Westbound and Bridgeport may sit idly by for 5 years, and they did not. Neither agreement states that Westbound and Bridgeport may act in bad faith. Neither provision quoted above contradicts the implied promises of good faith which we attribute to the agreements.

As we interpret the provision of the recording agreement quoted above, it states only that Westbound is not obligated to record the full minimum number of records set forth in another provision of the contract which The Ohio Players were obligated to record, or after going to the expense of making master recordings, to license them or make or sell records from the master recordings in the event the master recordings proved not to be suitable for that purpose. It does not mean, as plaintiffs urge, that Westbound is not required to make even one recording with The Ohio Players. And, the Bridgeport provision merely left to the discretion of the publisher the amount of advertising and publicity that would be given to any musical composition written by The Ohio Players. These provisions reserve to Westbound and Bridgeport discretion to control the content of recordings and the timing and number of releases. Flexibility of this type was essential in order to achieve the greatest success for The Ohio Players as well as Westbound and Bridgeport. Nothing in either the recording agreement or the publishing agreement or in the conduct of the parties demonstrates that Westbound or Bridgeport could or did use this discretion arbitrarily or in bad faith.

This interpretation of the recording agreement finds support in a seemingly unrelated provision of that agreement. The agreement was to run for an initial term of 5 years, but Westbound had the option to extend it for 2 years. If, as the plaintiffs contend, Westbound had absolutely no obligations under the contract, that extension would be practically automatic, for Westbound would have nothing to lose by exercising its option, and perhaps something to gain. The agreement would be essentially for one 7-year term, and the "option" phrasing a meaningless complication. Under our interpretation of the contract, however, the option provision makes perfect sense: Westbound could extend its right to the plaintiffs' services, but only at the cost of renewing its own obligation to use reasonable efforts on their behalf. The law prefers an interpretation that makes sense of the entire contract to one that leaves a provision with no sense or reason for being a part of a contract. See *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283, 154 N.E.2d 683; *White v. White* (1978), 62 Ill. App. 3d 375, 378 N.E.2d 1255.

In *Furrer v. International Health Assurance Co.* (1970), 256 Or. 429, 474 P.2d 759, the contract gave one of the parties absolute discretion regarding the amount of time he would spend in the performance of his duties; nevertheless, the Oregon court relied on *Wood v. Lucy* to hold

there was an implied promise of good faith performance. The doctrine announced in *Wood v. Lucy* involving an implied promise of good faith performance has become such an integral part of contract law that contractual terms should not be construed to negate it where they are ambiguous or subject to a contrary interpretation. We do not regard *Wood v. Lucy* as distinguishable from this case on the grounds advanced by the plaintiffs.

■■ The circuit court also erred in failing to give effect to the doctrine of promissory estoppel as a substitute for consideration. Decisions in Illinois as well as Michigan state that promissory estoppel may be relied upon to uphold a contract otherwise lacking in consideration or mutuality at the time of its execution, where injustice can be avoided only by enforcement of the promise. *Bank of Marion v. Robert "Chick" Fritz, Inc.* (1974), 57 Ill. 2d 120, 311 N.E.2d 138; *Wickstrom v. Vern E. Alden Co.* (1968), 99 Ill. App. 2d 254, 240 N.E.2d 401; *Estate of Timko v. Oral Roberts Evangelistic Association* (1974), 51 Mich. App. 662, 215 N.W.2d 750; see *S. M. Wilson & Co. v. Prepakt Concrete Co.* (1974), 23 Ill. App. 3d 137, 318 N.E.2d 722 (subcontractor's bid); *Vogue v. Shopping Centers, Inc.* (1975), 58 Mich. App. 421, 228 N.W.2d 403 (no express contract); *McMath v. Ford Motor Co.* (1977), 77 Mich. App. 721, 259 N.W.2d 140 (estoppel to assert Statute of Frauds); Restatement of Contracts §90 (1932).

■■ Prior to their agreement with Westbound, The Ohio Players had made only a few recordings, none of which met with great success. Their performances were mainly in nightclubs and discotheques; they were virtually unknown in the recording field. Yet, Westbound, in reliance upon the execution of the recording agreement by The Ohio Players, undertook a substantial business risk, incurring more than $80,000 in expenses which it could recoup only if the recordings were successful. The recording agreement provided for royalty payments to The Ohio Players at percentage rates ordinarily found in the record industry in contracts providing for exclusive services of performers over a period of time. Assuming Westbound and Bridgeport were not obligated to do anything, the expenses and liabilities they incurred in reasonable reliance upon enjoying the exclusive services of The Ohio Players for a 5-year period obligated The Ohio Players to perform as they promised to do.

Plaintiffs assert that promissory estoppel is not an appropriate doctrine in this case because it applies only when there is unjust enrichment. No Michigan authority is cited. However, because the agreements are supported by consideration, the defendants need not rest on the doctrine of promissory estoppel as a substitute for consideration. Our purpose in considering the promissory estoppel issue is primarily to illuminate the fundamental unfairness of the plaintiffs' claim, and so we

shall, for the sake of argument, accept the plaintiffs' legal doctrine that unjust enrichment is required.

The plaintiffs' theory is that there is no unjust enrichment once Westbound recoups its advances from the royalties The Ohio Players have earned, and thereby suffers no actual loss. This, however, is possible only because of the success The Ohio Players enjoyed in recording for Westbound. If we adopt the plaintiffs' view and refuse to enforce the agreement, the outlook at the time promissory estoppel arises, when Westbound, relying on plaintiffs' promises, works and advances money on their behalf, but before those efforts succeed or fail, is this: if the venture fails, Westbound's money will vanish, but if The Ohio Players become a hit, they will allow Westbound to break even. Conversely, The Ohio Players can do no worse than break even, having nothing invested, and they may perhaps enjoy a great profit, largely due to Westbound's work and backing. It is obvious that no one would ever voluntarily take Westbound's end of this deal. The Ohio Players should not be able to impose it on Westbound by backing out of their agreement. For The Ohio Players to obtain for themselves the possibility of a bonanza, while imposing the risk of loss on Westbound, by breaking their promises after Westbound's reliance on those promises for a period of almost 2 years, would unfairly enrich The Ohio Players at Westbound's expense.

■■ The Ohio Players had nothing to offer Westbound but an interest in their future, the chance to make a great deal of money by making them famous. The Ohio Players had nothing to lose; Westbound was to take all the risks. Having induced Westbound to perform as fully and faithfully as anyone could desire by signing these agreements, The Ohio Players now seek to deny Westbound the sole reward of its success. Their aim is to keep for themselves the fame and money which, judging by their past experience, they could not have acquired without Westbound's aid, by asserting that Westbound did not originally *promise* to do what it has already actually done. This the plaintiffs are estopped to do; even if the agreements were not originally supported by consideration, they became enforceable when Westbound performed in reliance on the promises of The Ohio Players, and indeed advanced additional monies not called for by the contract, to protect its investment.

The plaintiffs refer us to two recent English decisions involving exclusive service contracts for an extended period of time between songwriters and music publishers. The cases are: A. *Schroeder Music Publishing Co. v. Macaulay*, [1974] 3 All E.R. 616 (H.L.); *Clifford Davis Management Ltd. v. WEA Records Ltd.*, [1975] 1 All E.R. 237 (C.A.). These decisions are distinguishable. They avoid contracts not for lack of consideration but as unconscionable restraints of trade. Both of these

cases emphasize that the exclusive service agreements were oppressively one-sided, and that the songwriters in both cases were not represented by attorneys or advisers and lacked equality of bargaining power with the publishers. This is not the case here. The Ohio Players were represented by an attorney and advisers who conducted a portion of the negotiations with Westbound, and prior to signing their agreement with Westbound, The Ohio Players received competing offers from at least one other company engaged in the music recording business. Also, in contrast with the efforts expended and advances made by Westbound to promote and publicize The Ohio Players, there was no indication in either of the English decisions that there had been substantial activity by the music publisher which resulted in the distribution and sale of successful artistic creations produced by the songwriters.

For the above reasons, we conclude that the recording agreement and the publishing agreement were supported by consideration consisting of the cash advances and the mutual promises of the parties, and that the agreements may also be upheld by the doctrine of promissory estoppel. We next review the argument advanced by the plaintiffs that the agreements in question are unenforceable because of the failure to obtain approval of the contracts by the International Executive Board (the Executive Board) of the American Federation of Musicians (AFM).

The plaintiffs point to article 16, section 24 of the AFM bylaws, entitled "General Rules For All Traveling Engagements," and contend that this bylaw requires any contract which contemplates the recording of music to contain a provision that it will not become effective until approved by the Executive Board. Because the recording agreement contained no such provision and was never approved by the Executive Board, the plaintiffs contend it is ineffective and unenforceable.

Westbound responds to this argument in many ways, including: that for almost 2 years the parties performed under the recording agreement without objection from the AFM, The Ohio Players or anyone else that it required Executive Board approval; that the first suggestion that such approval was needed came from the attorney for Mercury Records long after the recording agreement was entered into and the parties had performed under it; that the AFM in a letter dated February 27, 1974, to the attorney representing the plaintiffs in this action acknowledged that the AFM bylaws were not applicable to the recording agreement, stating that because Westbound Records was not a signatory to any agreement with AFM, the arbitration provision of the AFM bylaws and rules and regulations could not apply to the recording agreement; that Westbound had no knowledge of the AFM bylaws on which plaintiffs rely; that the recording agreement made no reference to AFM bylaws and The Ohio

Players represented and warranted that they were under no restriction which would interfere in any manner with their performance under the recording agreement; and that because Westbound did not become a signatory of the AFM collective bargaining agreement until November 1974—11 months after the plaintiffs repudiated the recording agreement and 33 months after the recording agreement was signed—the AFM bylaws and rules and regulations did not apply to that agreement. Persuasive as many of these contentions are, we reject the plaintiffs' argument on another ground advanced by Westbound and Bridgeport.

■■ The defendants point out that article 16 of the AFM bylaws applies only to traveling engagements of union members. We agree with their contention. Article 15, section 1 of the bylaws defines the term "traveling engagement" as "an engagement in which any member performs outside the jurisdiction of his home local." Neither article 16 nor article 15, which is entitled "Traveling Engagement Wage Differential," refers to studio recording sessions. On the contrary, article 15, section 5 lists the types of "engagements" expressly exempted from the wage differential provisions applicable to "traveling engagements"; included in the exemptions are other engagements subject to a national scale as provided elsewhere than in article 15. Studio recording sessions are covered by a different article (article 24). This article deals with records and transcriptions, and provides in section 1 that the International President's office is to be consulted for prices and conditions for mechanical recordings and motion picture recordings. Thus, studio recording sessions are not included in the wage differentials set forth in article 15, which like article 16, applies to "traveling engagements." Both of these articles are filled with references which are neither relevant to nor compatible with studio recording sessions. They repeatedly refer to traveling bands and orchestras, traveling theatrical productions, band performances and engagements in such locales as pleasure cruises and theatres. Article 24 is entitled "Records and Transcriptions" and it clearly refers to the type of activity in which the recording agreement required The Ohio Players to engage. There is no reference in article 24 to article 15 or article 16 of the bylaws and no requirement in article 24 that executive board approval be obtained before a contract contemplating a studio recording session would be effective. Article 24 requires only that a recording contract be filed with the local in whose jurisdiction the recording takes place. We construe article 16, section 24, as well as the balance of article 16 and article 15, to pertain to live engagements, where a performer is also recorded, or where he is being broadcast live on radio or television, whether or not he is being simultaneously recorded. No parts of articles 15 or 16 appear to bear any relation to studio recording sessions, and no evidence was offered by the plaintiffs regarding any interpretation by the

AFM itself applying these articles to such activities. Our view is that studio recording sessions are governed only by article 24 of the AFM bylaws, and we find nothing in the bylaws or rules and regulations which required any executive board approval before the recording agreement would become effective.

■■ The agreements which are the subject matter of this appeal do not conflict with the Michigan statute (Mich. Comp. Laws Ann. §445.761 (1967)) outlawing restraints of trade. The statute relates only to restraints on employment after a contract ends; it does not prohibit employment contracts calling for an employee's exclusive services during the period of employment. (*Good v. Modern Globe, Inc.* (1956), 346 Mich. 602, 609, 78 N.W.2d 199, 204.) Although the recording agreement prohibits The Ohio Players from re-recording for a limited time those songs they recorded for Westbound, this provision does not restrain plaintiffs from engaging in the recording business. It merely protects Westbound's rights in a limited number of recordings.

■■ An additional portion of the circuit court's order which requires scrutiny is its termination of the recording agreement and the publishing agreement as of January 8, 1974, based on the finding that the agreements were severable and divisible into units of performance by the parties. We do not construe the agreements in that way. Partial performance by The Ohio Players was not the consideration Westbound and Bridgeport bargained for. Neither the recording agreement nor the publishing agreement specified that, by performing a specific portion of the agreement, The Ohio Players could be relieved from further performance. Nothing contained in the agreements indicates any intention of the parties that any single record, recording session or composition of The Ohio Players would serve as consideration for a specific unit of performances by Westbound or Bridgeport. Westbound and Bridgeport agreed to pay the royalty rates called for by the agreements because The Ohio Players promised to make a minimum number of recordings and to give Westbound and Bridgeport their exclusive services for 5 years.

■■ ■ A contract is not severable where the parties assented to all promises as a single whole. (*Meredith v. Knapp* (1965), 62 Ill. App. 2d 422, 425, 211 N.E.2d 151, 152.) A contract is nonseverable if the striking of any promise or set of promises would destroy the basis of the entire bargain. (*Meredith*, citing 6 Williston, Contracts §863 (3d ed. 1962).) These agreements gave The Ohio Players benefits early, and were to reward Westbound only later, if at all. To treat them as severable would allow The Ohio Players to take Westbound's services as long as they desired, and then abandon Westbound as soon as Westbound commenced to benefit from the arrangement. Westbound could only lose. We find

nothing in either agreement to warrant plaintiffs in accepting and rendering part performance and then repudiating the remainder of the contracts on the ground that their performance was severable. Westbound, Bridgeport and The Ohio Players negotiated and signed 5-year exclusive recording and publishing agreements, and there is no way of recasting them into contracts requiring only partial performance. The circuit court judge erred in the finding set forth in his order that the agreements are severable and susceptible of division and apportionment into units of performance.

Because the agreements which this action involves were valid and enforceable and not susceptible of division and apportionment, the circuit court erred in granting summary judgment in favor of the plaintiffs on the various counts of the complaint seeking a declaratory judgment. The court also erred in denying summary judgment in favor of Westbound and Bridgeport on those counts raising only the issue of the validity and enforceability of the agreements. Accordingly, the order appealed from is vacated and this cause is remanded for further proceedings consistent with the views expressed herein.

Order vacated and cause remanded.

McNAMARA and RIZZI, JJ., concur.