WESTBOUND RECORDS, INC., *et al.*, Plaintiffs-Appellants, *v.* PHONOGRAM, INC., *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 77-994

Opinion filed September 5, 1979.

Norman J. Barry and Joseph P. Della Maria, Jr., both of Chicago (Rothschild, Barry & Myers, of counsel), for appellants.

Levin & Berger, of Chicago (Sidney Z. Karasik, of counsel), for appellees.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

. This appeal is related to the appeal in *Bonner v. Westbound Records, Inc.* (1979), 76 Ill. App. 3d 736, 394 N.E.2d 1303, also decided today. In that case, a summary judgment holding that certain agreements between the plaintiffs (Bonner *et al.*) and the defendants (Westbound Records, Inc. and Bridgeport Music, Inc.) were void and unenforceable was reversed and remanded. To the extent that the facts and holdings set forth in the opinion in cause No. 77-542 are relevant to the disposition of this appeal, they are incorporated herein without restatement.

This is an action by Westbound Records, Inc., and Bridgeport Music, Inc. (referred to collectively as Westbound), against Phonogram, Inc., and Unichappell Music, Inc. (referred to collectively as Mercury

Records). The complaint charges that Mercury Records tortiously interfered with a contractual relationship Westbound had with LeRoy Bonner and four of his associates including Clarence Satchell (sometimes hereafter referred to as the Satchell group) who were members of a rock music group known as The Ohio Players. Mercury Records is a competitor of Westbound and in the same line of business.

The circuit court granted summary judgment in favor of Mercury Records and against Westbound. In granting this summary judgment, the circuit court judge referred to the summary judgment previously granted in favor of the Satchell group and against Westbound (appealed to this court as cause No. 77-542) and incorporated the order granting summary judgment in favor of the Satchell group into the order granting summary judgment in this case. The circuit court judge then found that Westbound was "bound by equitable estoppel and *res judicata* from asserting herein anything other than as found" in the order granting summary judgment in favor of the Satchell group. We believe that the trial judge intended in his finding to refer to collateral estoppel or estoppel by judgment rather than to "equitable estoppel." The trial judge then found that Mercury Records could not be guilty of tortious interference with any business relationship between The Ohio Players and Westbound or of tortiously inducing The Ohio Players or the Satchell group to breach their contracts with Westbound because there were no binding contracts between them.

The issues raised by this appeal are: did the circuit court err in granting summary judgment in favor of Mercury Records and against Westbound on the ground stated in the court's order? and, are there issues of fact to be resolved in determining whether Mercury Records tortiously interfered with contractual or business relationships between The Ohio Players or the Satchell group and Westbound?

■■ For the answer to the first question we refer to our opinion disposing of the appeal in cause No. 77-542. In that opinion we held that the circuit court erred in finding that the agreements between The Ohio Players and Westbound were void and unenforceable and we reversed and remanded the summary judgment entered against Westbound. Thus nothing decided in *Bonner v. Westbound* precludes Westbound by collateral estoppel, estoppel by verdict or *res judicata* from contending in this action that there were valid and enforceable contracts between Westbound and The Ohio Players with which Mercury Records tortiously interfered, and the circuit court judge erred in this case in so finding. The foundation for the circuit court's summary judgment in favor of Mercury Records is shattered by our decision in *Bonner v. Westbound Records, Inc.* Therefore, the summary judgment in this case must be reversed and remanded for further proceedings unless no issue of fact appears with respect to whether Mercury Records may have tortiously interfered with

the contractual or business relationships between The Ohio Players and Westbound or induced the Satchell group to breach those agreements.

The facts presented by Mercury Records may be summarized as follows: Mercury Records first learned in the fall of 1973 that The Ohio Players were interested in a new recording contract. This information came to Mercury Records from Elzy White who at that time was not affiliated with Mercury Records, Westbound or The Ohio Players. White informed the west coast division head of Mercury Records, Denny Rosencrantz, that The Ohio Players were in search of a new recording contract and that their arrangement with Westbound was expiring. Rosencrantz referred the matter to Mercury Records' president Irwin Steinberg. Steinberg instructed Rosencrantz to pursue the matter, but first to determine if in fact The Ohio Players were available and free to contract with a new recording company. Rosencrantz then set up a meeting with The Ohio Players in Chicago, which took place on November 29, 1973.

At the meeting in Chicago The Ohio Players were represented by Elzy White, Clarence Satchell and Hubert Satchell, father of Clarence. Steinberg represented Mercury Records. At this time The Ohio Players had still not familiarized Elzy White with the terms of the existing Westbound contract. Clarence Satchell stated the terms of a new recording contract desired by The Ohio Players. Steinberg responded that these were not objectionable. But on learning that the Westbound agreement had not yet expired, Steinberg brought the discussions to an abrupt end. Steinberg said that Mercury Records could not pursue the matter because of the existing agreement with Westbound.

Satchell however persisted in discussing the matter further and represented to Steinberg that the Westbound agreement had been breached by Westbound and that it could be terminated. Steinberg responded that he could not advise Satchell on this point, but that when the agreement with Westbound was terminated, Mercury Records would be interested in further discussions of a new contract.

After the November 29, 1973, meeting, Mercury Records drafted the terms of an agreement which it planned to offer to The Ohio Players in the event they were free to execute a new recording agreement. The terms of the new agreement were discussed at a subsequent meeting with Satchell in the middle of December 1973, along with other topics he raised, including monetary advances and production control. Mercury Records informed The Ohio Players that if their relationship with Westbound was as Satchell had represented, Mercury Records would discuss the proposed topics in more detail.

Mercury Records did not have a copy of the agreement between The Ohio Players and Westbound at the time of the mid-December 1973

meeting. Subsequently, a copy of that agreement was furnished to Mercury Records, and Mercury Records determined that the agreement was terminable. The Ohio Players terminated their agreement with Westbound on January 8, 1974, and Mercury Records tendered its proposed contract with The Ohio Players which was accepted and executed on January 14, 1974.

The facts advanced by Westbound, taken from the depositions of Rosencrantz, Steinberg, Clarence Satchell and Carol Forney, Steinberg's assistant, and also based on exhibits, generally parallel the time sequence set forth by Mercury Records, but differ in several material respects from the details set forth by Mercury Records. As early as September 1973, Mercury Records was urging The Ohio Players to join its organization. Rosencrantz, head of Mercury Records' west coast division, had numerous discussions with Elzy White, who Westbound identifies as the manager of The Ohio Players. These conversations commenced in September 1973. Mercury Records reimbursed White in the amount of $50 for numerous lengthy phone calls in connection with the negotiations. The interoffice memorandum approving this expenditure was dated December 7, 1973. It was written by Forney and stated, "We are presently negotiating with * * * The Ohio Players."

Rosencrantz proposed and arranged a meeting in November 1973 in Chicago between Steinberg, White, Clarence Satchell and Hubert Satchell, his father. Before the meeting, Rosencrantz wrote to Steinberg that "at this point it looks very good and I know how bad we want this act." During the November 29 meeting in Chicago, Clarence Satchell informed Steinberg that their group was still under contract with Westbound. Satchell explained, however, that he felt their contract with Westbound had been breached and that the agreement could be broken because The Ohio Players were not receiving adequate royalty payments. Steinberg responded, "Well, the day you do that, come back and talk to me." Despite Steinberg's statement, Mercury Records presented a written proposal for an exclusive recording agreement to the Satchell group on December 7, 1973. This proposal included a $50,000 bonus for signing. The author of the letter setting forth that proposal was Forney. She admitted that it contained a detailed offer for a recording agreement between the Satchell group and Mercury Records and that she had received the details of the proposal from Steinberg himself.

The Mercury Records' proposal to the Satchell group stated that a contract between Mercury Records and the Satchell group would become effective only upon termination of the agreement between Westbound and The Ohio Players. So far as Steinberg could recall, the royalty rate proposed was the highest ever paid by Mercury Records with the exception of one other musical group.

After Steinberg's meeting with Clarence Satchell, his father, and White on November 29, 1973, Mercury Records sought and obtained copies of the contract between Westbound and The Ohio Players. Mercury Records delivered a copy of the agreement to its attorney, Leonard Levin, who handled all of Mercury Records' legal matters, and requested his opinion as to its validity. Mercury Records also initiated an investigation into whether Westbound was a signatory to a labor agreement with the American Federation of Musicians (AFM). This investigation led Levin to conclude erroneously that Westbound signed an AFM labor agreement in 1973.

Within a week after his November 29, 1973, meeting with Steinberg, Clarence Satchell consulted a new attorney, Richard Shelton, regarding his group's contractual obligations to Westbound. Shelton had represented other artists in negotiating contracts with Mercury Records and had known Steinberg for 25 years. Clarence Satchell claimed he was introduced to Shelton by his father, but admitted that neither his father nor Elzy White knew Shelton prior to their initial meeting. Clarence Satchell assumed that his father, a resident of Dayton, Ohio, had done some "research"—"on his own if he did it"—to find a specialist in music law. This evidence raises a factual issue as to whether Mercury Records steered Satchell to Shelton.

In any event, Levin and Shelton then worked together to find a means by which the Satchell group could escape from their obligations under the agreement with Westbound. In mid-December 1973, approximately 10 days after Mercury Records had presented its proposed exclusive recording agreement to the Satchell group, Satchell and the other members of his group had a meeting at Mercury Records with Steinberg. At that meeting, the parties fully negotiated the terms of a recording agreement between the Satchell group and Mercury Records, although they did not reduce it to writing.

On January 8, 1974, Shelton wrote to Westbound on behalf of the five members of the The Ohio Players who comprised the Satchell group purporting to terminate their contract with Westbound. The letter asserted that the contract lacked mutuality of obligation and had not been approved by the AFM.

In a letter dated January 10, 1974, to the New York office of Mercury Records, Levin stated that he and Shelton had jointly concluded that the Westbound contract was invalid. He further stated that Shelton would furnish Mercury Records with a "comfort letter" setting forth his opinion as to its invalidity. In a memorandum to Forney, Steinberg wrote on January 8, 1974:

> "I enclose the proposal for the Ohio Players as well as a copy of their agreement with Westbound. Dick Shelton agrees that their

contract is terminable with Westbound immediately. Levin is working with Shelton and will advise us. This is a very high priority item.

Further, I believe we should meet to complete the details of the recording agreement and perhaps to even gamble on its preparation since the Ohio Players want to record immediately."

On January 12, 1974, the Satchell group signed the exclusive recording contract with Mercury Records which had been negotiated the previous December. It called for the payment of a $50,000 advance to the Satchell group, $40,000 of which was to be held in escrow until such time as Mercury Records was "of the opinion that there is no likelihood of litigation with Westbound." Several days later, Mercury Records agreed that the escrow would be released when the Satchell group filed suit against Westbound and obtained a final ruling that the Westbound agreement was invalid.

After Mercury Records signed the Satchell group, Mercury Records gave White a 1-year contract as National Promotional Director, Rhythm and Blues, but he had only vague and unspecified duties. After his "employment" with Mercury Records, White returned to the Satchell group as business manager. In the record business, agents or managers are usually compensated by the performers rather than the recording company, and Mercury Records had never before compensated people such as White.

This factual recitation demonstrates the sharp difference between Westbound and Mercury Records with respect to how the latter's contacts with the Satchell group are to be viewed. Mercury Records contends the facts add up only to an innocent effort to promote its business in a legitimate manner by negotiating with performers who were advised by their own attorney they were not bound to continue their relationship with Westbound. Mercury Records argues that its conduct was not wrongful, but was permissible as a "competitor's privilege," its acts being wholly to advance its own competitive position.

Westbound contends the facts it presents show that Mercury Records, with knowledge that The Ohio Players had a contract with Westbound, importuned and induced the Satchell group to leave Westbound and, in effect, ruptured the contractual and business relationship between Westbound and The Ohio Players by the following conduct: Mercury Records offered the Satchell group more money. It promised White a job if the Satchell group would leave Westbound and sign up with Mercury Records. It negotiated and reached full agreement with the Satchell group prior to any attempt to determine the validity of their contract with Westbound. It provided the Satchell group with lawyers to advise them how to get out of their commitment to

Westbound. Mercury Records veiled its negotiations with the Satchell group by delaying the execution of an agreement with them until their attorneys rendered an opinion that they were not bound to perform for Westbound, although the complete terms of the deal between Mercury Records and the Satchell group had been agreed upon approximately one month earlier. Mercury Records then encouraged litigation against Westbound by paying the Satchell group $10,000 and agreeing to pay them $40,000 additional when they filed suit against Westbound and obtained a final ruling that the Westbound contract was invalid.

Mercury Records' position stated in its brief in this court is that "it took no action to induce the Players to breach their contract with Westbound," and that it "refused to conduct negotiations until it was assured there was no subsisting contract with" Westbound. Westbound disputes these assertions, stating that the intention of Mercury Records was to steal The Ohio Players from Westbound and that it was negotiating to that end and had agreed on terms with the Satchell group even before it received the opinion from attorneys Levin and Shelton that Westbound had no legal claim on The Ohio Players.

Whether Mercury Records offered the Satchell group $50,000 and the service of attorneys to desert their contractual obligation or whether Mercury Records innocently negotiated with and signed a performing group which it in good faith believed had no commitment to Westbound is a disputed question of fact.

Mercury Records explains that its initial contact with The Ohio Players was when its officials thought that the agreement between Westbound and The Ohio Players had already expired. However, Mercury Records concedes that after obtaining copies of the Westbound agreements which showed Mercury Records that the contracts had 3 years to run, it persevered in its efforts to persuade The Ohio Players to terminate their relationship with Westbound. Whether Mercury Records' pursuit of the Satchell group from September 1973 until January 1974 and the inducements offered the Satchell group to leave Westbound constitute proper or improper interference also presents an issue for the trier of fact.

Examination of the pleadings, the depositions, admissions, affidavits and exhibits reveals numerous genuine disagreements between Westbound and Mercury Records concerning material facts. Construing the pleadings and evidence submitted most strictly against the moving party (Mercury Records) and most liberally in favor of the opponent (Westbound) as the law relating to summary judgment commands us to do (*Smothers v. Butler* (Docket No. 78-2, filed August 8, 1979), ___ Ill. App. 3d ___, ___ N.E.2d ___; *Kolakowski v. Voris* (1979), 76 Ill. App. 3d 453, 395 N.E.2d 6; *Heller v. Sullivan* (1978), 57 Ill. App. 3d 190, 372

N.E.2d 1036), it appears that Westbound could recover against Mercury Records for, as alleged in the complaint, tortiously tampering and interfering with and inducing the breach of a 5-year contract between Westbound and The Ohio Players which had at least 3 years to run. Summary judgment was granted on the ground that the contract was not valid, but our holding in *Bonner v. Westbound* establishes that this conclusion was incorrect.

■■ Westbound's allegations cannot be disposed of without the resolution of many disputed factual issues and without considering facts from which many inconsistent inferences could be drawn by a trier of fact. For these reasons the circuit court erred in granting summary judgment in favor of Mercury Records, and this cause must be reversed and remanded for trial.

Westbound presents several theories to justify recovery against Mercury Records even if it had no valid contract with The Ohio Players; but, we need not discuss them. There was a valid contract, and none of the other theories advanced by Westbound offers it any advantage over its claim for interfering with or inducing a breach of a valid contract.

Reversed and remanded.

McNAMARA and RIZZI, JJ., concur.