**Emmett BONFIELD, Plaintiff,**

v.

**AAMCO TRANSMISSIONS,
INC., Defendant.**

No. 88 C 7059.

United States District Court,
N.D. Illinois, E.D.

July 5, 1989.

A.J. Hohman, Jr., Hope, Hohman & Georges, San Antonio, Tex., Timothy J. McGonegle, Ashcraft & Ashcraft, Ltd., Chicago, Ill., for plaintiff.

Marc P. Seidler, John F. Verhey, Rudnick & Wolfe, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This is a sequel to the "Opinion" (708 F.Supp. 867 (N.D.Ill.1989)[1]) issued in this case just four months ago, disposing of all but two of Bonfield's claims. After issuance of the Opinion, Bonfield filed a two-count First Amended Complaint (the "Complaint") asserting:

    1. in Count I that omissions by AAMCO violated the Franchise Act, and

    2. in Count II that AAMCO breached its duty of good faith and fair dealing:

        (a) by omitting to provide material information to Bonfield before he became a franchisee and

        (b) by unilaterally changing its procedures after he became a franchisee.

Once again AAMCO has responded with a multi-pronged motion, seeking:

    1. to obtain summary judgment on Count I under Rule 56;

    2. to dismiss the portion of Count II relating to alleged omissions under Rule 12(b)(6); and

    3. to strike Bonfield's jury demand.

For the reasons stated in this memorandum opinion and order, all three of AAMCO's motions are granted.

*Disposition of AAMCO's Motions*[2]

### 1. *Count I*

While Opinion at 875–78 dismissed Bonfield's Franchise Act claim to the extent it was based on AAMCO's alleged misrepresentations, *id.* at 878–80 reserved ruling on the aspect of that claim that was based on AAMCO's omissions. That had to be done because neither party had adequately addressed the timing issue: What event or date ends the franchisor's disclosure obligation under the Franchise Act?

In response to the implied invitation to speak to that issue, AAMCO Mem. 4–6 now says that occurred when the parties entered into a binding franchise agreement— either September 4 or September 8, 1986. AAMCO then says it is entitled to summary judgment because it did not receive information indicating investigations by the various state Attorneys General until after both those dates.

Bonfield does not dispute the notion that the relevant event for disclosure purposes is when the parties had a binding agreement. But his position is that the Agreement here was contingent on Bankruptcy Court approval. Though n. 6 reflects that position is factually inaccurate, what *is* clear is that such approval was not obtained until November 17, 1986 (or November 3, 1986 at the earliest). Bonfield would be happy if either date marked the end of AAMCO's disclosure obligation, because by then AAMCO certainly knew something was afoot with at least some Attorneys General.

Bonfield also claims that new evidence (not presented during the first motion) shows AAMCO really knew of the various investigations well before September 4. If so, AAMCO cannot obtain summary judg-

---

**1.** All further citations to the Opinion will simply take the form "Opinion at ——," including the F.Supp. page number but omitting its volume number. This opinion will also continue (without repeating the definitions of) the terminology used in the Opinion, except that "Complaint" will refer to the current version, rather than to the original version, of Bonfield's pleading.

**2.** Opinion at 870–73 sets out the facts (now repeated in the Complaint) in some detail. As to the current Rule 12(b)(6) motion on Count II, however, account will also be taken of Bonfield's added new allegations. And needless to say, the same principles enunciated in Opinion at 870 apply to the current Rule 56 and Rule 12(b)(6) motions.

ment even on its own view of the date on which Bonfield became bound.

## A. *When Did AAMCO's Disclosure Obligation End?*

Section 702(2)(a) says the Franchise Act is intended to "provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered for sale" (accord, *Vitkauskas v. State Farm Mutual Automobile Insurance Co.*, 157 Ill.App.3d 317, 325, 109 Ill.Dec. 373, 378, 509 N.E.2d 1385, 1390 (3d Dist.1987)). That goal—assuring a franchisee's intelligent investment decision—led Opinion at 880 to this unexceptionable conclusion:

> Once that decision has been made, no statutory purpose is served by requiring a continuing disclosure obligation.

But that really marked the beginning rather than the end of the analysis. Opinion at 880 identified the possibility that, unlike the context of a securities sale, the franchise situation—with its several conditions to be met before the franchisee can begin operations—might implicate an ongoing investment decision (and hence an ongoing disclosure obligation). That of course was intended to convey the idea that any conditions requiring satisfaction before Bonfield's commitment became ironclad might give Bonfield a potential "out" if any material nondisclosure took place before the last of those conditions was met.

In AAMCO's view the issue is a simple one: All that need be looked at is the date of Bonfield's execution of the Agreement. First, the Franchise Act itself suggests that such execution ends the franchisor's disclosure obligation (see Section 704(2) and the discussion in Opinion at 879). Second, each of the only two cases that have been identified as analyzing similar franchise statutes has viewed that event as the critical one for disclosure purposes (see, e.g., *Avery v. Solargizer International, Inc.*, 427 N.W.2d 675, 682 (Minn.Ct.App.1988) (disclosure violations would have occurred (if at all) when franchise agreements signed); *Fantastic Enterprises, Inc. v. S.M.R. Enterprises, Inc.*, 540 N.Y.S.2d 131, 134 (Sup.Ct.1988) (right to relief accrued when plaintiffs entered into franchise agreement)).[3]

On September 4, 1986 Bonfield executed the Agreement, but it was then conditioned on approval by AAMCO following the Board of Review hearing—in conventional offer-and-acceptance terms, Bonfield might perhaps have gotten out of the deal had he withdrawn his offer before it was accepted in that fashion. But that was certainly no longer true once AAMCO approved Bonfield by its September 8 letter. At that point a binding executed agreement existed, and from AAMCO's perspective that is the outside date on which its disclosure obligation ended.[4]

Bonfield Mem. [5][5] responds that because his purchase was contingent on Bankruptcy Court approval,[6] the Agree-

---

**3.** AAMCO Mem. 6–7 cited and discussed *Avery*, while *Fantastic Enterprises* was unearthed through in-chambers research. As has been too frequently the case in the motion practice in this lawsuit, Bonfield provided nothing to aid in the analysis.

**4.** September 4 might also be a logical candidate, for at that point Bonfield had made his investment decision. As Opinion at 880 observed, mutuality of obligation no longer necessarily dominates contractual doctrine. All the same, September 8 appears preferable for current purposes:

1. It gives Bonfield every benefit of the doubt (a desirable approach on a motion such as AAMCO's).
2. It avoids any possible inequity in allowing AAMCO to terminate its disclosure obli-

gation during a period when it possessed the unilateral right to reject the Agreement.

**5.** Because Bonfield's memorandum has no page numbers, this opinion has supplied them (indicated by brackets). That purely mechanical deficiency is completely overshadowed by the substantive inadequacy of Bonfield's responsive memorandum, which devotes only a single paragraph to discussing the relevant date for disclosure purposes—and without a single case citation!

**6.** Bankruptcy Court approval covered only the sale of the Wheaton center from the prior franchisee (which was the subject of bankruptcy proceedings) to Bonfield. There was no need to obtain approval of the AAMCO–Bonfield Agreement itself. Thus such Bankruptcy Court approval as Bonfield needed to get was not really

ment was not final and AAMCO's disclosure obligation therefore did not end until that happened. But that position is countered not only by its misstatement of the legal situation as to the need for such approval (see n. 6) and by the already-identified franchise cases holding the critical disclosure date to be the execution date of the agreement, but also by numerous cases in the related securities law field[7]—each holding that the relevant event for determining materiality is when the plaintiff committed himself to the transaction, even if there then remained conditions subsequent to the contract (see, e.g., *Michaels v. Michaels*, 767 F.2d 1185, 1195 (7th Cir. 1985) (materiality determined on the basis of the date plaintiff committed himself to selling)[8]; *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972) (materiality determined on date insider committed himself to purchase, not on later formal closing date when delivery and payment were completed)). And of course the securities law materiality analysis is particularly analogous here (Opinion at 880 n. 12).

■ In sum, both parties were obligated to their deal by September 8. At that point a binding agreement existed—an agreement fixing the parties' obligations. AAMCO was not unilaterally free to reject Bonfield after that date, in the same way that an offeror remains free to withdraw its offer before it has been accepted.[9] On September 8 Bonfield was assured of an AAMCO franchise so long as he performed whatever subsequent conditions remained. On that date his investment decision, made a few days earlier, became irrevocable by him. And that is therefore the date on which AAMCO's disclosure obligation ended.

### B. *Did AAMCO Know of Attorney General Investigations Before September 8?*

■ As at the earlier stage of this case, AAMCO urges the claimed omissions in disclosure are not actionable because AAMCO had no knowledge of any Attorney General's investigation before the critical disclosure date. Bonfield now responds that AAMCO had knowledge of the contemplated actions by the Attorneys General as early as April 1986. He cites to interrogatory answers by AAMCO in a related lawsuit, which reveal (Bonfield Mem.Ex. A, at 7–8):

1. AAMCO met with Texas Assistant Attorney General Stephen Gardner ("Gardner") on April 15, 1986. Gardner made an informal request for documents, which AAMCO then produced.

2. AAMCO met with Washington Assistant Attorneys General Donna Fisher and Carl Baettner on May 1, 1986. During that meeting AAMCO was served with a Civil Investigative Demand ("CID"), and it was served with a Supplemental CID on October 6, 1986.

3. AAMCO met with Massachusetts Assistant Attorney General Paul Merry on July 8, 1986. AAMCO was served with a CID from that office on September 28.

Bonfield has submitted no evidence that tends to show AAMCO knew, by September 8, 1986, of any investigation that might be viewed as material to its disclosure obligations to Bonfield. Rather he seeks to infer (because he does not know the sub-

---

a precondition to validity of the Agreement. Under Agreement § 1.2 Bonfield was unconditionally obligated to operate his center at the Wheaton location, and it was *his* burden (not AAMCO's) to do whatever was necessary to carry out that obligation.

**7.** Opinion at 876 explains that cases addressing Rule 10b–5 principles are particularly appropriate here.

**8.** This past year our Court of Appeals has twice reconfirmed that principle: see *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1237–38 n. 7 (7th Cir.1988), characterizing the holding in *LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F.2d 928, 931–32 (7th Cir.1988) as "misrepresentations made after an investor is legally committed to a sale or purchase cannot form the basis for a Rule 10b–5 action."

**9.** Cf. *Amoroso v. Southwestern Drilling Multi–Rig Partnership No. 1*, 646 F.Supp. 141, 145 (N.D.Cal.1986) (date of "sale" for 1933 Securities Act Section 12(2) purposes is when parties entered into mutually enforceable contract).

stance of those meetings) that AAMCO was put on notice of such material investigation by the pre-September 8 meetings. But no such inference is supported by the evidence here.

As for the April 15 meeting, Opinion at 879 n. 11 rejected the same argument on Bonfield's part:

> Bonfield Mem. 10 suggests AAMCO may have known about the investigation as early as April 15, 1986, when its attorneys met with the Texas Attorney General. But Bonfield Mem.Ex. D clearly shows that meeting took place "before any notice of any kind to AAMCO of any possible action" by the Attorney General. Hence Bonfield's suggestion is unsupported by the evidence.

Nothing has changed that conclusion, and hence that meeting will not be considered further.

That leaves only the meetings with the Washington and Massachusetts Attorneys General. But neither of those meetings even hinted at matters material for disclosure to a prospective Illinois franchisee, let alone their suggesting the broad framework of investigation that was brought to AAMCO's attention only *after* the critical September 8 date. Indeed, Bonfield's own evidence reflects that AAMCO itself initiated these two pre-September contacts and that no wisp of smoke, to say nothing of any gun, was the result of either meeting.

Thus AAMCO's General Counsel Mary McMonagle ("McMonagle") said its Director of Consumer Affairs Richard Brooks met with the Washington Assistant Attorneys General as part of AAMCO's "regular liaison with state consumer affairs agencies" (AAMCO R.Mem.Ex. A ¶ 10). In August 1986 AAMCO was told the matter had been "back burnered" (*id.* ¶ 12).

As for the Massachusetts contact, it was again AAMCO that approached the Massachusetts Attorney General, this time as to CIDs served on AAMCO franchisees. Initially AAMCO was told no information could be provided, because it was a third party (*id.* ¶ 13). McMonagle testified AAMCO was never informed—either expressly or by implication—that it was the target of an investigation (*id.* ¶ 16).

Unquestionably Bonfield has provided no *evidence* suggesting that AAMCO knew of any investigations affecting it (and surely no evidence suggests it knew of anything arguably material to an Illinois franchisee such as Bonfield) before September 8. True enough, Bonfield is entitled to reasonable inferences. But it would go far beyond "reasonable inferences" to indulge the highly attenuated speculation that AAMCO knew of material investigative matters it should have disclosed to Bonfield on the critical date.

In summary, Bonfield has failed at each level of the inquiry here. AAMCO is entitled to summary judgment on Count I.

### 2. *Count II*

█ Bonfield's original complaint alleged AAMCO had breached its duty of good faith and fair dealing "by unilaterally changing its procedures resulting in the inability of BONFIELD to achieve operational success" (Opinion at 884, quoting Bonfield Mem. 22). That claim withstood AAMCO's first motion to dismiss, and it is not now the subject of a renewed challenge.

But Bonfield's new Complaint adds a second prong to the good faith and fair dealing claim (Complaint Count II ¶ 14):

> BONFIELD would further show that the acts and conduct of AAMCO with regard to the concealments and/or omissions made the basis of this lawsuit ... violated AAMCO's obligations and duties of good faith and fair dealing....

AAMCO now moves to dismiss *that* portion of Count II, asserting the obligation of good faith does not extend to precontractual negotiations.

AAMCO is quite right. As a matter of definition, the implied duty at issue here stems from contractual obligations: It exists to supplement the terms of an *existing* contract, limiting the discretion of the parties in their performance (Opinion at 884–85). *Foster Enterprises, Inc. v. Germania Federal Savings and Loan Association,* 97 Ill.App.3d 22, 28, 52 Ill.Dec. 303, 308,

421 N.E.2d 1375, 1380 (3d Dist.1981) (emphasis added) stated the doctrine succinctly:

> There can not be any doubt that a covenant of fair dealing and good faith is implied *into every contract* absent express disavowal.[10]

Bonfield's attempt thus to bootstrap his omissions claim (already twice rejected, once as a fraud claim and now as a Franchise Act violation) is really irresponsible. His Mem. 5 totally mischaracterizes the Opinion:

> This Court has already recognized that BONFIELD's original allegations raised a issue as to AAMCO's breach of its duty of good faith and fair dealing regarding the failure to disclose the negotiations with the 14 States Attorneys General at the time that BONFIELD was becoming an AAMCO Franchisee.

It takes only a quick review of Opinion at 884–85 to see it did *not* hold Bonfield's omissions claim was a breach of the duty of good faith. This Court's discussion was focused exclusively on Bonfield's claim based on AAMCO's asserted unilateral change in policies.

Nor is this the first occasion on which the weakness of Bonfield's legal position has been signaled by his failure to cite a single case in support of his position. Instead the only two cases he does cite—*Dayan* and *Foster*—cut against his position, if anything.

And to forestall a third possible return to the same battlefield, it should be said that Bonfield could not assert a claim based on omissions *after* the contract was formed either. Nothing in Illinois case law suggests the extension of the implied good-faith duty to a contracting party's disclosure obligations. As already stated, it merely "imposes a limitation on the exercise of discretion vested in 'one of the parties to a contract.'" Here the Agreement created no duty—discretionary or otherwise—requiring AAMCO to notify franchisees in the post-signing pre-closing status of any pending investigations or any other matter.

In short, Bonfield's attempt to salvage his omission claim in this alternative way must fail. AAMCO's motion is granted.

### 3. *Jury Demand*

Bonfield's original complaint contained a jury demand.[11] AAMCO says he waived that right when he signed the Agreement, which provides:

> **21.2 Jury Trial Waived.** Franchisee and AAMCO hereby agree that they shall and hereby do waive trial by jury in any action, proceeding or counterclaim, whether at law or at equity, brought by either of them, or in any matter whatsoever which arises out of or is connected in any way with this Agreement or its performance.

■ Although the Seventh Amendment guarantees the right to a jury trial in civil cases, that right—like most constitutional rights—is waivable.[12] As to the standard for determining the existence of such a waiver, *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811–12, 81 L.Ed. 1177 (1937) (footnote omitted) has said:

> But, as the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver.

And of course the question whether the right has been waived is governed by fed-

---

**10.** [Footnote by this Court] See also *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 990–91, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1st Dist. 1984) (citations omitted and emphasis added):
[T]he doctrine of good faith *performance* imposes a limitation on the exercise of discretion vested in one of the parties *to a contract.*
And see the extended and instructive discussion of the Illinois doctrine of good faith and fair dealing by this Court's colleague Honorable William Hart in *Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1289–92 (N.D.Ill.1983).

**11.** Although the new Complaint did not expressly renew that demand, it is fair to carry that demand forward into the new Complaint advancing the same issues. AAMCO does not challenge that proposition (Mem. 2 n. 2).

**12.** Cf. *D.H. Overmyer Co. of Ohio v. Frick Co.*, 405 U.S. 174, 187, 92 S.Ct. 775, 783, 31 L.Ed.2d 124 (1972) (contractual waiver of pre-judgment notice and hearing not violative of Fourteenth Amendment rights).

eral, not state, law even in a diversity case such as this (*Simler v. Conner*, 372 U.S. 221, 222, 83 S.Ct. 609, 610–11, 9 L.Ed.2d 691 (1963) (per curiam)).

Many cases indeed have upheld contractual waivers of jury trial in comparable circumstances (see, e.g., *Telum, Inc. v. E.F. Hutton Credit Corp.*, 859 F.2d 835, 837–38 (10th Cir.1988); *Leasing Service Corp. v. Crane*, 804 F.2d 828, 832–33 (4th Cir.1986); *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755–58 (6th Cir.1985); *In re Reggie Packing Co.*, 671 F.Supp. 571, 573–74 (N.D.Ill.1987)), some in the identical context of franchisor-franchisee agreements (see, e.g., *Smith–Johnson Motor Corp. v. Hoffman Motors Corp.*, 411 F.Supp. 670, 675–77 (E.D.Va.1975); *Seligson v. Plum Tree, Inc.*, 361 F.Supp. 748, 758 (E.D.Pa. 1973)). Although no one disputes that the right is waivable, the case law is divided as to who bears the burden of proving waiver: Some courts say the party seeking to enforce the waiver has that burden (see, e.g., *Leasing Service*, 804 F.2d at 833), while others say the party seeking to avoid the waiver does (see, e.g., *K.M.C.*, 757 F.2d at 758; 5 *Moore's Federal Practice* ¶ 38.46, at 38–428 to 38–429 (1988)). No decision appears to have touched on the required standard of proof—whether by a preponderance of the evidence or something greater.

█ Our own Court of Appeals has not addressed either of those evidentiary issues referred to in the preceding paragraph. Nor is it necessary for this Court to do so, for irrespective of which party carries the burden of proof and whatever the applicable evidentiary standard, in this instance it is plain that Bonfield knowingly and intelligently waived his right:

1. Examination of the Agreement confirms just how clear the waiver provision was. In fact, like all the captions introducing the Agreement's textual provisions, "Jury Trial Waived" was in boldface type.

2. Cades *expressly* discussed the waiver with Bonfield during the Board of Review hearing (Tr. 55–56).

3. Bonfield was an experienced businessman.

4. Bonfield was represented by counsel, though *he* chose not to have his lawyer review the Agreement.

Bonfield proffers a number of responses to AAMCO's jury waiver argument. None is persuasive.

First Bonfield asserts he did not understand the jury waiver or its effect (Mem. [2]). That contention must be rejected in light of the disclosure during the Hearing (Tr. 55–56):

CADES: Ah, the Federal Trade Commission Orders, you must, must comply with those in your dealing with us as well as the public. Has your attorney pointed out to you the waiver of jury trial, oh you didn't show him this did you? That's right. You didn't see that?

BONFIELD: No.

CADES: It's in every Franchise Agreement over the last ten years at least.

BONFIELD: What's a waiver of jury trial?

CADES: Okay simply put, if you were to go to court against us ...

BONFIELD: They nail your hands to the wall, right ...

CADES: ... and squeeze your testes.

BONFIELD: (laughter).

CADES: If you were to take action against AAMCO, or AAMCO were to take action against you, that action being based on the Franchise Agreement or the exercise of the franchise, either party, both parties have waived jury. Not trial, but have waived jury.

BONFIELD: What is the reason for that? The cost of the hearing or?

CADES: It could be. I think it also gets it down to a matter of law and, and to facts instead of the emotion and everything else that's happen with a jury. One of the reasons liability insurance is up to a minimum of a million dollars, because of juries. Because of people awarding damages. Three disputes if not resolved, they go to binding arbitration. The letter you signed Emmett refers to specific paragraphs of the Franchise Agreement. Three of them.

Those paragraphs say simply you will use only AAMCO repair orders, you will account for all repair orders, you will report accurately and promptly, week after week after week for the life of your agreement and you will pay franchise fees on the receipt from your center. You understand the pool structure, right?

BONFIELD: Um-hm.

Cades (like Bonfield also a nonlawyer) thus specifically explained there that one reason for the waiver was the large verdicts juries tend to award. If that did not grab Bonfield's attention, nothing would. It must be remembered that the issue is not whether Bonfield understood the reason that AAMCO wanted a nonjury trial rather than a jury trial, but rather whether Bonfield *knew* that was what AAMCO wanted and agreed to it. Of that there can be no doubt—and Bonfield voiced no complaint and asked nothing further. There is simply no evidence to bolster his present naked assertion that he did not understand that he was waiving a jury trial.

Bonfield also urges the Agreement was an adhesion contract as to which the parties possessed unequal bargaining power. It is true that Cades specifically told Bonfield AAMCO would accept no changes in the contract (Tr. 42). But AAMCO's stated unwillingness to accept contract changes—its "take it or leave it" position—does not vitiate Bonfield's waiver. Nothing compelled him to accept AAMCO's franchise—he was perfectly free to reject the deal. This is not the kind of case that supports a "necessitous men are not free men" approach. AAMCO was within its rights in taking the position:

> If you want one of our franchises, you must do so on our terms.

To put matters in the ultimately relevant sense, Bonfield did *not* have the right to say:

> I will accept an AAMCO franchise, but I can decide which of its terms I do and which I do not agree to accept as binding on me.

Nothing here calls on a court to rescue Bonfield from a contract (or a contract term) entered into knowingly and voluntarily.

Finally, Bonfield says the waiver was invalid because he did not have his counsel review it. But that was *his* election—certainly his lawyer *could* have reviewed it. AAMCO may not have its rights adversely affected by Bonfield's own failure to have the Agreement gone over by his counsel.

There is no question Bonfield knowingly and intelligently waived his right to a jury trial via an explicit and clear agreement to do so. AAMCO is entitled to have the contract enforced. Bonfield's jury demand is stricken.

### *Conclusion*

There is no genuine issue of material fact, and AAMCO is entitled to a judgment as a matter of law on Count I. That count is dismissed.

Bonfield's attempt to bootstrap his omission claim into Count II is also rejected. That portion of the Count II claim is flawed and therefore dismissed.

Finally, Bonfield has waived his right to a jury trial. His jury demand is stricken.

At this stage what remains of Bonfield's claim (the balance of Complaint Count II) has been defined and should be susceptible to swift readiness for trial. This action is set for a status hearing at 9 a.m. July 17, 1989 to discuss that subject.

### APPENDIX

After this opinion was already written and had reached the typing stage, this Court received the opinion in *FDIC v. W.R. Grace & Co.*, 877 F.2d 614 (7th Cir.1989). Writing for the Court of Appeals in a fraud case for which Illinois law provided the rules of decision (as is also true for this case), Judge Posner said (at 619 (citations omitted)):

> The difficult question on liability is whether Grace was required to volunteer to Continental, before the loan closed, the bad news about the Southwest Piney Woods field. An omission can of course be actionable as a fraud.... But not *every* failure by a seller (or borrower, or

employee, etc.) to disclose information to the buyer (or lender, or employer, etc.) that would cause the latter to reassess the deal is actionable. A general duty of disclosure would turn every bargaining relationship into a fiduciary one. There would no longer be such a thing as arm's-length bargaining, and enterprise and commerce would be impeded.

That statement of the general policy reason for the law's traditional "caveat emptor" approach also provides an abbreviated explanation of why, in a case like the present one, a franchisor is not subjected to the kind of disclosure obligation that Bonfield seeks to impose on AAMCO even after the Agreement was committed to by both parties and the transaction was in the process of being implemented. That quoted statement is followed a bit later by this colorful excerpt that has equal applicability to the present case (*id.* at 620 (citation omitted)):

> [W]e do not understand Grace to be contesting the issue of duty but only to be arguing that Continental had made a firm commitment by April 7 (if not earlier)—a commitment that it could not have backed out of even if Grace had come to it on May 8 and told it that the Loch Ness monster had swallowed the entire State of Mississippi so that Continental would not recoup a penny of the $75 million loan that it had not yet made but was committed to make. If the commitment was *that* firm, the fraud was immaterial.

In the opinion's explication between the two quoted excerpts, *W.R. Grace* suggests a cost-benefit-type rationale for the occasional case in which courts find the existence of a disclosure obligation before a deal is closed. But to the extent that might be read to suggest the possibility that AAMCO was still obligated, after execution of the Agreement and before Bonfield's store opening, to disclose what AAMCO had learned in the interim from its meetings with the Attorneys General, that possible suggestion would find no warrant in the Franchise Act or any franchising

cases in Illinois or elsewhere, or for that matter in Illinois case law generally. Nothing in *W.R. Grace* calls for reconsideration of the principles announced, or the conclusions reached, in this opinion.