CHRISTOPHER MUKA *et al.*, Petitioners-Appellants, v. THE ESTATE OF STEPHEN L. MUKA, Respondent-Appellee.

Second District    No. 2—86—1142

Opinion filed December 21, 1987.

Cynthia M. Juco and Lee A. Weiss, both of Neal, Gerber & Eisenberg, of Chicago (H. Nicholas Berberian, of counsel), for appellants.

Barry Jerol Cohen, of Chicago, for appellee.

JUSTICE DUNN delivered the opinion of the court:

Petitioners, Christopher Muka, Radio Guide, Inc., and Christopher Muka derivatively on behalf of Radio Guide, Inc., filed claims in the circuit court of Du Page County against the estate of Christopher's brother, Stephen L. Muka (the Estate), based on an alleged contract between Stephen and Christopher. Petitioners also filed a jury demand. On the Estate's motion, the trial court dismissed the claims with prejudice. Petitioners filed a motion for reconsideration which was denied. Petitioners appeal arguing that their claim states a cause of action in contract and that a material question of fact remains of whether the contract was performed. We agree and, therefore, reverse.

The following facts were alleged in petitioners' claims. Stephen Muka was a founder and principal shareholder of U.S. Robotics, Inc.

As of June 30, 1985, Stephen valued his U.S. Robotics stock at approximately $3.4 million. On or about July 25, 1984, Stephen agreed with his brother Christopher that if Christopher would leave his then current job prospects in Pennsylvania and work with Stephen in a business enterprise in Chicago, Stephen would ensure that at the end of one year Christopher's equity interest in the new business would be at least $1 million or, failing that, Stephen would personally give Christopher $1 million worth of U.S. Robotics stock. Christopher was also to receive a yearly salary of $22,000.

The terms of the agreement were reduced to writing in a letter agreement prepared by Stephen which provides as follows:

"To: Chris Muka

Dear Christopher,

This is a letter of intent concerning your involvement in two projects: The business radio station idea, and the keyboard dot idea.

The exact form of the corporate entity which may tackle these ideas is changing from day to day. Percentages are varying etc. *** But it is my intention that you will have a significant equity interest in these ventures and at the end of a yr. be worth at least $1,000,000. out of this, hopefully more.

Even if all else fails, and US Robotics elects not to give you a lot of stock in the new subsidiary, I will personally give you $1,000,000. worth of my USR stock, provided you work reasonably hard & smart at things in the next yr.

Good Luck!

/s/ Stephen Muka

Stephen Muka

7/25/84

P.S. We have also agreed to a salary of $22,000 per yr."

In late July 1984, Christopher moved to Chicago and began working with Stephen. Radio Guide, Inc., was the business enterprise eventually formed by the brothers. Christopher was named president of Radio Guide and held a 25% interest in the corporation. Stephen retained a 75% interest.

Stephen Muka died on July 11, 1985. On or about July 7, 1985, however, he made a tape recording of what he intended to be his last will and testament. Stephen directed his attorney to reduce the recording to writing, but the attorney did not do so before Stephen's death. The tape allegedly directs the transfer of all of Stephen's U.S. Robotics stock into Radio Guide and also directs that Christopher is to receive $100,000 in cash. Christopher's 25% interest in Radio Guide,

plus the cash, would then equal nearly $1 million, the amount set forth in the letter agreement.

Since Stephen's death, the Estate has refused to transfer any of Stephen's U.S. Robotics stock to Radio Guide. Publication of Radio Guide has ceased, and Christopher alleges that its stock has no present value. Christopher thus filed the instant claim in which he alleges his performance under the agreement. He seeks from the Estate either $1 million or such shares of U.S. Robotics stock having an equal value. Radio Guide's claim seeks an amount equal to the value of all of Stephen's U.S. Robotics stock based on the foregoing and on Stephen's promises that his U.S. Robotics stock would be utilized to fund the operations of Radio Guide.

The Estate filed a motion to dismiss the claims and stated therein that the motion was brought pursuant to section 2—619 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1985, ch. 110, par. 2—619). The motion alleged that no contract existed between Stephen and petitioners at the time of Stephen's death, and that the petitioners' claims are based on contingent, not absolute, liability. There appears to have been some confusion in the trial court as to whether the motion was to be decided on the basis of section 2—619 or on section 2—615 of the Code (Ill. Rev. Stat. 1985, ch. 110, par. 2—615). In granting the motion to dismiss, the court did not specify the reason for doing so. On petitioners' motion for reconsideration, however, the court stated that it was proceeding as if on a section 2—615 motion and concluded that the reason for dismissal was that he "could not see any conceivable way" that petitioners could recover.

The confusion in the proceedings below over whether the Estate's motion was granted pursuant to section 2—615 or section 2—619 has carried over into this appeal. The Estate contends that the motion was actually a section 2—615 motion which was inadvertently mislabeled, and that petitioners were not prejudiced by the mislabeling. The Estate argues that the basis of its motion—that petitioners failed to state a claim on which relief could be granted because no contract existed at Stephen's death—conforms in substance and legal theory to section 2—615.

■ Petitioners convincingly argue, however, that the Estate's defense could only be brought under section 2—619(a)(9), which provides that an action may be dismissed if the claim is "barred by other affirmative matter avoiding the legal effect of or defeating the claim." (Ill. Rev. Stat. 1985, ch. 110. par. 2—619(a)(9).) Petitioners note that the actual basis of the Estate's defense was that Stephen's obligations under the alleged contract were discharged because personal services

which he was required to perform, *i.e.*, determine if Christopher had performed, had not been completed by the time of Stephen's death. In the case of *In re Estate of Bajonski* (1984), 129 Ill. App. 3d 361, a similar defense was raised, and the parties likewise disagreed as to which section governed. The court stated that "[d]ischarge of one's contractual obligations because of death is 'in the nature of a defense' that negates the alleged cause of action when the person who died was the one required to render the personal performance," which should therefore be brought under section 2—619. (129 Ill. App. 3d at 365.) Even though, as here, the matter had not been treated as a section 2—619 motion below, the court held that it would be proper to treat the matter on appeal as such. (129 Ill. App. 3d at 366.) As did the *Bajonski* court, we, too, will review this matter under the standards applicable to section 2—619. In passing, however, we note that the petition here does appear to state a cause of action in contract sufficient to withstand a section 2—615 motion.

▪ The *Bajonski* court determined that the crucial issue for review there was whether the contract in question required the personal services of the decedent. (129 Ill. App. 3d at 366.) The same issue is also critical in this case. If, as the Estate argues, the contract required Stephen's personal performance, Stephen's death excuses further performance. (129 Ill. App. 3d at 366.) If, on the other hand, the contract did not depend on Stephen's continued existence for its performance, the contract survives Stephen's death and can be performed by the Estate. (129 Ill. App. 3d at 366-67.) We would then be faced with a question of fact of whether Christopher has performed his part of the bargain. When such a material question of fact is raised, a section 2—619 motion must be denied if the case is one in which plaintiff is entitled to a jury and has properly requested one. (*Ramer v. Storment* (1983), 119 Ill. App. 3d 79, 83.) As noted above, petitioners here filed a jury demand with their claim.

The parties initially dispute whether the contract called for Stephen's personal subjective satisfaction with Christopher's performance, or if Christopher's performance should be judged under an objective standard. The Estate argues that only Stephen could determine if Christopher had performed as the contract required. Petitioners, however, characterize the agreement as a "best efforts" or "reasonable efforts" contract under which a jury can determine if the contract has been performed. See, *e.g.*, *Ralph v. Karr Manufacturing Co.* (1974), 20 Ill. App. 3d 450, 454.

▪ Petitioners' characterization of the agreement is supported by the explicit language contained therein. The contract only called for

Christopher to work *reasonably* hard and smart. The language of the contract in *Bajonski*, in contrast, specifically states that performance was "subject to" the decedent's acceptance. (*In re Estate of Bajonski* (1984), 129 Ill. App. 3d 361, 367.) This clear and unambiguous language reserving judgment to the decedent was a principal reason for the *Bajonski* court's determination that only the decedent could perform the contract. No such reservation is set forth here. Furthermore, as will be more fully discussed below, an objective standard is generally preferred if subjective approval is not explicitly reserved. It therefore appears that the agreement here did not depend upon Stephen's personal satisfaction, so that a jury can objectively decide if Christopher performed as required.

■■ ■ Petitioners further urge that, even if we were to decide that the contract called for Stephen's personal satisfaction, an objective "reasonable man" standard would be appropriate to judge Christopher's performance. Petitioners correctly note that there are two types of satisfaction contracts. In the first class, a subjective standard of satisfaction is employed. "[T]he decision as to whether a party is satisfied is completely reserved to the party for whose benefit the clause is inserted, and the reasons for his decision may not be inquired into and overhauled by either the other party or the courts." (*Forman v. Benson* (1983), 112 Ill. App. 3d 1070, 1074.) Contracts in this class involve matters which are dependent upon the personal feelings, taste or judgment of the party making the decision. (112 Ill. App. 3d at 1074.) The classic example of this type of contract is one for the painting of a portrait. (*Wolff v. Smith* (1940), 303 Ill. App. 413.) The life of the party to be satisfied is essential to the performance of the contract, so such contracts terminate at the death of that party. See, *e.g.*, *Mecartney v. Estate of Carbine* (1903), 108 Ill. App. 282, 286.

■■ ■ In the second type of satisfaction contract, however, an objective standard is used to measure performance. In such cases, the party to be satisfied must base his determination on grounds which are reasonable and just. (*Forman v. Benson* (1983), 112 Ill. App. 3d 1070, 1074.) Such contracts involve matters which are capable of objective evaluation or which involve operative fitness or mechanical utility; financial matters often fall within this category. (112 Ill. App. 3d at 1074.) Because satisfaction in these cases is judged by a reasonable man standard and is open to judicial scrutiny (112 Ill. App. 3d at 1075), the life of the person to be satisfied is not essential for the completion of the contract. In these instances, a jury can make the determination using an objective standard.

In arguing that the contract in question falls within the first category, the Estate relies on *Deltak, Inc. v. Schwartz* (1983), 119 Ill. App. 3d 119. In *Deltak*, the court held that the contract in question was a personal service contract terminable upon the subjective dissatisfaction of the employer. (119 Ill. App. 3d at 125.) The Estate argues here that the contract between Stephen and Christopher was likewise subject to Stephen's personal judgment. The specific language of the *Deltak* contract, however, reserved satisfaction as to quality of submitted work to a specific individual. (119 Ill. App. 3d at 125.) Likewise in *Forman v. Benson*, the court, in holding that a subjective standard was proper, emphasized that the clause in question was added as a concession to the party to be satisfied. (*Forman v. Benson* (1983), 112 Ill. App. 3d 1070, 1077.) The contract here makes no such reservation, and since Stephen drafted the agreement, he could have done so if he desired. To the contrary, Stephen specified that Christopher only had to work "reasonably hard and smart" at things, suggesting an objective standard.

As noted above, courts generally prefer a reasonable man standard over a subjective standard when it is unclear whether subjective satisfaction is reserved. (*Forman*, 112 Ill. App. 3d at 1076.) This preference is also set forth in section 228 of the Restatement (Second) of Contracts, which provides:

"When it is a condition of an obligor's duty that he be satisfied with respect to the obligee's performance or with respect to something else, and it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied." (Restatement (Second) of Contracts §228 (1981).)

The comments to that section note that where an agreement does not make clear that it requires subjective satisfaction, "it will not usually be supposed that the obligee has assumed the risk of the obligor's unreasonable, even if honest, dissatisfaction." (Restatement (Second) of Contracts §228, comment *b*, at 183 (1981).) It is true in this case that the imprecise description of Christopher's obligation may make an objective judgment of his performance somewhat difficult. It is apparent, though, that the term "at things" refers to the business projects which Christopher and Stephen were to develop. Use of an objective standard is thus still practicable, so whether Christopher had worked reasonably hard and smart at the projects is a question of fact for the jury.

■ Although we hold that Christopher's performance should be judged on an objective basis, we also note that petitioners did allege that, before his death, Stephen expressed personal satisfaction with Christopher's performance in the tape recording he made in July 1985. It is axiomatic that on a motion to dismiss, we must accept as true all well-pleaded facts. (*Moreno v. Joe Perillo Pontiac, Inc.* (1983), 112 Ill. App. 3d 670, 675.) The Estate argues, however, that the tape is not a will and is therefore inadmissible. The Estate is entirely correct regarding the tape's admissibility *as a will* (see Ill. Rev. Stat. 1985, ch. 110½, par. 4—3), but petitioners here are not attempting to introduce the tape as a will. Petitioners are merely arguing that the tape is evidence of Stephen's satisfaction as required by the contract. "Recordings which are otherwise competent, material, and relevant are admissible if a proper foundation has been established." (*Roedl v. Lane* (1976), 41 Ill. App. 3d 1062, 1067.) Furthermore, the Dead Man's Act (Ill. Rev. Stat. 1985, ch. 110, par. 8—201) does not bar admission of the tape recording. The Dead Man's Act prohibits an interested party from testifying in his own behalf regarding a conversation with the deceased (*Manning v. Mock* (1983), 119 Ill. App. 3d 788, 800), but does not prohibit the introduction of a tape recording made by the decedent himself. The tape here thus appears to raise a material issue of fact of whether Stephen expressed his satisfaction with Christopher's performance.

■ Finally, the Estate argues that, due to the contingent nature of Christopher's claim, the trial court properly dismissed the petition. This argument is not persuasive. The Estate is arguing that the unfulfilled contingency is Stephen's approval. As just discussed, whether Stephen approved is a question of fact, even assuming his personal satisfaction was required.

For the foregoing reasons, the judgment of the circuit court of Du Page County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

UNVERZAGT and WOODWARD, JJ., concur.