## INCOMM, INC. *v.* THERMO-SPA, INC.

SUPERIOR COURT    JUDICIAL DISTRICT OF    FILE No. 95128
WATERBURY

Memorandum filed March 12, 1991

*P. J. Yamin,* for the plaintiff.

*C. C. Hallas,* for the defendant.

BLUE, J. This is a dispute between an advertising agency and a spa manufacturer concerning an ill-fated contract to produce a brochure. The plaintiff, Incomm, Inc., has sued the defendant, Thermo-Spa, Inc., for money damages for work that the plaintiff performed for the defendant pursuant to the contract. An evidentiary hearing was held on February 13, 1991, at which the court heard the testimony of Al Pirozzoli, the plaintiff's president and creative director, and Andrew Tournas, the vice president in charge of advertising for the defendant, and received a number of documentary exhibits. For the reasons that follow, judgment must enter in favor of the plaintiff.

In 1989, the defendant invited about four or five advertising agencies, including the plaintiff, to bid for the job of producing a brochure to advertise the defendant's products. The plaintiff made what Pirozzoli termed a "speculative presentation" at its own expense. This apparently involved the presentation of advertising brochures the plaintiff had produced for other clients and ideas it had in mind for the defendant. On May 31, 1989, the plaintiff sent the defendant "[a] presentation of cost estimates" for, respectively, a twelve and a sixteen page brochure. The total estimate for concept, copy, edit, contact, layout, type spec, mechanicals, typesetting, photostats and materials was $6260.

After reviewing the plaintiff's presentation and those submitted by other bidders, Tournas decided to hire the plaintiff for the job. On July 6, 1989, he signed a purchase order for a sixteen page brochure. The purchase order was on the defendant's form and was directed to

the plaintiff. The preprinted part of this document stated: "Order is to be entered in accordance with prices, delivery and specifications shown below." The description of what was ordered was as follows: "16 PAGE Full Color Brochure—Includes Concept—copy edit,—contact layout, typespec & mechanicals. Includes all typesetting, photostats and materials. Total cost: $6260."

In order for the brochure to be produced, it was necessary for the parties to cooperate with each other to an extensive degree. A brochure like the one contemplated by the parties here (this is something on which they agree) synthesized substantive information supplied by the defendant with an advertising concept designed by the plaintiff. The plaintiff could not simply produce the brochure on its own. It required input from the defendant. As a practical matter, it was necessary for the parties to work together.

An imposing amount of work on the parts of both parties ensued. On August 21, 1989, both parties signed off on a final draft of the text for the brochure. This was the fourth revision, consisting of thirteen single spaced, typewritten pages, and both Pirozzoli and Tournas contributed substantially. Tournas submitted copy and Pirozzoli edited. The text, however, was an easy matter compared to the graphics. Pirozzoli submitted at least seven detailed sketches and layouts for the brochure, each of them running to several pages. This plainly involved a great deal of labor and at least some creative ability on his part.

Beauty, however, is in the eye of the beholder. Tournas did not like what he saw. In fact, the reason why so many drafts had to be produced was that Tournas was essentially dissatisfied with what Pirozzoli was producing. This dissatisfaction eventually led the defendant to breach the contract.

On September 13, 1989, Tournas telephoned Pirozzoli and instructed the plaintiff to return all materials to the defendant, stating that the defendant would finish the job in-house. The plaintiff complied with this request. On the same date, the plaintiff sent a bill to the defendant for $5606. That amount covered the labor, purchased materials and tax concerning the work done to that date. At this point, much of the final work on the brochure had been done although, as mentioned, Tournas found it unsatisfactory. The defendant eventually hired another agency to produce a brochure, which incorporated the text and many, although not all, of the graphics contained in Pirozzoli's layouts.

The initial question for the court to determine is whether the dealings between the plaintiff and the defendant constituted transactions "in goods" for purposes of General Statutes § 42a-2-102 and is thus governed by article two of the Uniform Commercial Code, or, whether the contract was one for services governed by the common law of contract. "Goods" are defined by General Statutes § 42a-2-105 (1) as "all things, including specially manufactured goods, which are moveable at the time of identification to the contract." This is obviously a broad definition, but the court does not believe that it includes what the defendant intended to purchase here. The defendant, it is true, ultimately wished to obtain a physical layout of a brochure that it could take to a printer. It is clear that it did not expect the plaintiff to produce the printed brochure itself. A careful review of the evidence, including the purchase order, however, persuades the court that this was predominately a contract for the purchase of services. The purchase order specifies such services as the concept, editing and contact layout. Moreover, as discussed previously, it was implicit in the parties' agreement that they would closely work together in producing the brochure.

The defendant was plainly purchasing both services and materials. "In such hybrid transactions, the question becomes whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *G-W-L, Inc.* v. *Robichaux,* 643 S.W.2d 392, 394 (Tex. 1982). The "essence" of what was being purchased here was work, labor and services rather than materials. See *North American Leisure Corporation* v. *A & B Duplicators, Ltd.,* 468 F.2d 695 (2d Cir. 1972) (contract to reproduce master tape held to be one for services); *Filmservice Laboratories, Inc.* v. *Harvey Bernhard Enterprises, Inc.,* 208 Cal. App. 3d 1297, 256 Cal. Rptr. 735 (1989) (contract to manufacture release prints of a motion picture held to be one for services). The service component of the agreement at issue here was at least as "essential" as the service component of the cases just cited. The court concludes that the common law of contract, rather than the Uniform Commercial Code, governs the dispute in this case.

With this in mind, the court finds that a binding contract was formed on July 6, 1989, when the defendant's officer, Tournas, signed a purchase order that, in effect, accepted the plaintiff's bid of May 31, 1989. See *John J. Brennan Construction Corporation, Inc.* v. *Shelton,* 187 Conn. 695, 702, 448 A.2d 180 (1982). At that point, there was a bargain in which there was a manifestation of mutual assent to the exchange between the two parties; see *Ubysz* v. *DiPietro,* 185 Conn. 47, 51, 440 A.2d 830 (1981); and a mutuality of obligation; see *Hess* v. *Dumouchel Paper Co.,* 154 Conn. 343, 347, 225 A.2d 797 (1966). It was an implied condition of the contract that the parties would cooperate with each other in producing the brochure. Otherwise, as discussed previously, the brochure would have been impossible to produce.

Tournas testified that his understanding of the agreement was that the brochure was subject to his approval

and that no money was to be paid until and unless that approval was given. Pirozzoli denied the existence of any such condition. The court finds that such a condition of approval was neither expressed nor implied in the contact.

The contract here was essentially one for a work of art, albeit commercial art, in which approval or disapproval would necessarily turn on aesthetic factors personal to the beholder. It is, of course, possible for parties to contract for the production of a work of art subject to the buyer's satisfaction, and such a contract, if made, will be enforced. *Zaleski* v. *Clark,* 44 Conn. 218 (1876), involving a sculptor's contract to make a bust satisfactory to his patron, is a good example. The patron in that case was dissatisfied with what was, in fact, "a fine piece of work." Id., 219. She was held not obligated to pay for it because her actual satisfaction was a condition of the contract and she was not actually satisfied.

In the present case, unlike *Zaleski,* there was no express condition that payment for the brochure was subject to the buyer's satisfaction. This is fatal to the defendant's position for two reasons. First, the purchase order here was drafted by the defendant's officer, Tournas, on the defendant's order form and contains no hint that payment was subject to the defendant's approval of the brochure. It is axiomatic that a contract is to be "construed most strongly against the party whose language it is." *Sturman* v. *Sacha,* 191 Conn. 1, 9, 463 A.2d 527 (1983). Second, there are, moreover, forceful policy reasons against inferring an approval condition in any contract for the purchase of an artistic product. As *Zaleski* shows, such a condition is an onerous one.

A comment to the Restatement notes that "if the obligor would subject the obligee's right to compensa-

tion to his own idiosyncrasies, he must use clear language." 2 Restatement (Second), Contracts § 228, comment (b). In the absence of such clear language, "it will not usually be supposed that the obligee has assumed the risk of the obligor's unreasonable, even if honest dissatisfaction. In such a case, to the extent that it is practicable to apply an objective test of reasonable satisfaction such a test will be applied." Id. This proposition finds substantial support in case law. See *Bruegger* v. *National Old Line Ins. Co.,* 387 F. Sup. 1177, 1182 (D. Wyo. 1975), remanded on other grounds, 529 F.2d 869 (10th Cir. 1976); *Muka* v. *Estate of Muka,* 164 Ill. App. 3d 223, 229–30, 517 N.E.2d 673 (1987); *Rooney* v. *Weeks,* 290 Mass. 18, 27, 194 N.E. 666 (1935); *Young* v. *Tate,* 232 Neb. 915, 918, 442 N.W.2d 865 (1989); *Yarno* v. *Hedlund Box & Lumber Co.,* 129 Wash. 457, 469, 225 P. 659 (1924); see 17A C.J.S. Construction Against Party Using Words § 324, p. 219 (1963).

The cases just cited involve contracts to purchase more or less standard commercial products or services where a test of reasonable satisfaction has at least some chance of sensible application. But what about a contract for the purchase of a work of art? As noted above, beauty is in the eye of the beholder. De gustibus non est disputandum. The fact that an artistic creation has been given the seal of approval of that jack-of-all-trades, the reasonable man, is likely to be scant comfort to a person who genuinely despises it and nevertheless finds himself obliged to purchase it. Its value to him will be nil. There are, however, other considerations hanging in the balance. A contrary rule would subject an artist's right to compensation for what might well be hundreds of hours of labor, not to mention whatever talent and training he happens to possess, to the purchaser's whim. As previously discussed, if the parties wish to write such a condition into their contract, there is

nothing to stop them. But in the absence of such an express condition—especially where it is the purchaser who has drawn the contract—a condition of personal satisfaction will not be implied by the courts. The few courts to have considered this issue have reached just this conclusion. See *Aztec Film Productions* v. *Prescott Valley, Inc.,* 128 Ariz. 402, 626 P.2d 132 (1981) (contract for a film script); *Brand* v. *Godwin,* 8 N.Y.S. 339 (1890) (contract for a singer in an opera company); *Anderson* v. *Long,* 56 Pa. Super. 183 (1914) (contract for theatrical costumes). In each of these cases, an objective test of reasonable satisfaction has been employed. In practice, this has meant, and in the case of an artistic product, can only sensibly mean, that unless the work of art in question is patently deficient, it passes judicial muster.

The court has carefully examined the various submissions prepared by the plaintiff in the present case. It cannot say that they are deficient or unskillfully rendered in any way. In fact, as noted, they bear a strong resemblance to the brochure that the defendant ultimately found to its liking. This is not, of course, high art. It is possible that a jury of artists or advertisers could harbor a very low opinion of the product that the plaintiff has produced. The court, however, can neither discern nor articulate any objective reason for reasonable dissatisfaction.

Under these circumstances, Tournas' September 13, 1989 telephone call to Pirozzoli breached the contract. It repudiated the implied duty that the defendant had under the contract to cooperate with the plaintiff to produce the brochure. See *Gilman* v. *Pedersen,* 182 Conn. 582, 584, 438 A.2d 780 (1981). The plaintiff's remaining duties to render performance were expressly discharged and the defendant's repudiation gave rise to a claim for damages for total breach. 2 Restatement (Second), supra, § 253.

Finally, the court must determine the appropriate amount of damages to be awarded to the plaintiff. "The general rule for measuring damages in a contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed." *Loda* v. *H. K. Sargeant & Associates, Inc.,* 188 Conn. 69, 81, 448 A.2d 812 (1982). Had the contract here been fully performed, the plaintiff would have received $6260. In a case of anticipatory breach, however, "the injured party is expected to avoid losses if he can do so without unreasonable effort and expense, and his damages are limited accordingly." 4 A. Corbin, Contracts (1951) p. 832. The plaintiff's damages must be so limited. Its final bill for the services it actually rendered and the product it actually produced was for the amount of $5606. For reasons already discussed, damages here cannot sensibly be measured by the value of the services performed or materials submitted. "Value" in a case like this is entirely subjective, and if the court cannot measure it objectively, it cannot measure it at all. The plaintiff's final bill, however, covers the labor, purchased materials, and tax for the work done by the plaintiff prior to the breach. After reviewing the evidence, the court is persuaded that this final bill was reasonable under the circumstances for the labor actually rendered, the materials purchased by the plaintiff, and the tax it must pay. An award of this sum will also protect the plaintiff's expectation interest by putting it in the position it would have been in had the contract been performed, with an appropriate adjustment for the losses it reasonably avoided by stopping work at the time of the breach. The court finds that that is the appropriate amount of damages.

Judgment will consequently enter for the plaintiff in the amount of $5606 plus costs.