Dan BERAHA, M.D., Plaintiff–Appellant,

v.

BAXTER HEALTH CARE CORPO-
RATION, Defendant–Appellee.

No. 90–3789.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1991.

Decided March 17, 1992.

Rehearing and Rehearing En Banc Denied
April 28, 1992.

Keith V. Rockey, (argued), Timothy J. Haller, Kathleen A. Lyons, Rockey & Rifkin, Joseph N. Hosteny, Niro, Scavone, Haller & Niro, Chicago, Ill., for plaintiff-appellant.

Granger Cook, Jr., (argued), Gary W. McFarron, Cook, Egan, McFarron & Manzo, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr., RIPPLE and MANION, Circuit Judges.

MANION, Circuit Judge.

Invoking the diversity jurisdiction of the federal court, Dan Beraha, M.D., filed suit against Baxter Health Care Corporation ("Baxter") based on an exclusive patent license agreement ("license agreement") between Beraha and Omnis Surgical, Inc. ("Omnis"), a Baxter affiliate that was later merged into Baxter.[1] Count I of the Complaint claimed that Baxter violated express and implied obligations of good faith and fair dealing in the license agreement; Count II claimed that Baxter breached a fiduciary obligation under the license agreement; and Count III alleged that Baxter made false representations to Beraha at the time of the license agreement. The district court issued summary judgment in favor of Baxter on all three counts. Beraha appeals, however, only from the district court's summary judgment on Counts I and III. We affirm in part, vacate in part and remand the case to the district court for further proceedings.

## I. Background

A license agreement for the development of a biopsy needle lies at the center of this controversy. Baxter makes and sells a variety of medical products, including a needle for performing prostate biopsies known as the Tru–Cut needle. In 1983, Beraha, a physician specializing in urology, designed a biopsy needle that he believed was an improvement over the Tru–Cut biopsy needle. In February 1984, Beraha filed an application to patent his improvement.[2] In April and May of 1984, Beraha negotiated with Baxter for the grant of a license under the patent application and any resulting patent. At the time of these negotiations, Beraha had not made or tested the biopsy needle claimed in his patent application.

During initial negotiations with Baxter, Beraha sought the advice of his patent attorney, Macdonald Wiggins. In a letter to Michael Cannizzaro, Vice President for Sales & Marketing at Omnis, dated April 20, 1984, Wiggins stated that he had reviewed the terms Baxter had proposed to Beraha for rights to Beraha's invention. Wiggins then listed for Cannizzaro the recommendations that he made to Beraha. Under those recommendations, Baxter would receive an exclusive license to manufacture and sell Beraha's invention worldwide. Baxter would pay Beraha a royalty of $1.00 on each unit sold during the pendency of the application and for the term of any patent that eventually issued from the application. If the application for the patent were rejected, the royalty would be reduced to 50 cents on each unit for a period of ten years, and Baxter would have a royalty-free license thereafter. Baxter would pay Beraha an advance royalty of $50,000 when the license agreement was executed. After the first anniversary of the license agreement, Baxter would guarantee Beraha a minimum annual royalty of $50,000. As an alternative to a license agreement, Wiggins suggested an agree-

---

1. For simplicity, we will usually refer to both "Baxter" and "Omnis" as "Baxter." While Beraha negotiated and signed the license agreement with Omnis, the point at which Omnis was merged into Baxter remains unclear, and in any event is not material to this opinion.

2. A patent eventually issued in 1986 as U.S. Patent No. 4,600,014.

ment in which Beraha would assign all rights in the invention and any patent issuing on the invention. Under the assignment agreement, Beraha would receive a downpayment of $100,000, annual payments of $50,000 for ten years, and royalties of 25 cents per unit sold for the life of the patent or 12.5 cents per unit sold for ten years after a final rejection of the patent.

On May 1, 1984, Paul Flattery, Associate General Counsel for Baxter, sent Beraha a patent license agreement counter-proposal that Cannizzaro wanted to discuss with Beraha at a meeting in New Orleans. The letter accompanying the counter-proposal stated that Cannizzaro wanted to deal directly with Beraha regarding the financial terms of the license agreement but that if Beraha had any other questions regarding the license agreement, Flattery would work with Beraha's attorney to resolve them prior to the meeting. Under the counter-proposal, Baxter would acquire an exclusive license. Beraha would receive an advance royalty payment of $20,000, an earned royalty of three percent of net sales and a guaranteed minimum annual royalty of $10,000 after the first anniversary of the license agreement. If no patent issued before the third anniversary of the license agreement, no further earned royalties would be due. The counter-proposal limited the total royalties over the life of the license agreement to $500,000. It further provided that Baxter could convert the license to a nonexclusive license by written notice to Beraha at any time after the third anniversary of the license agreement and cease minimum annual royalty obligations. If Beraha subsequently granted a license under the licensed patent at a royalty rate less than that paid by Baxter, then Baxter would be entitled to reduce its royalty to the rate charged to the other licensee. Baxter could terminate the license at any time upon ninety days written notice to Beraha.

On May 8, 1984, at Cannizzaro's request, Beraha met with Victor Chaltiel, president of Omnis, and Cannizzaro in New Orleans to negotiate the terms of the license agreement. No attorneys were present at the meeting. The discussions focused on the Baxter counter-proposal. Chaltiel and Beraha went through the counter-proposal paragraph by paragraph, making changes and initialling them.

At the end of the meeting, the parties had a marked-up copy of the counter-proposal that increased the advance royalty from $20,000 to $50,000, deleted the provision for minimum annual royalties, and deleted the cap on total royalties that would be paid to Beraha. The royalty rate was increased from three percent to three and one-half percent, and the time period during which royalties would be paid even if no patent issued was extended from three to four years. The agreement deleted Baxter's option to convert the license to a non-exclusive license and terminate the license upon written notice. The increase in the advance royalty from $20,000 to $50,000 served as a trade-off against minimum annual royalties. While Chaltiel gave some oral assurance to Beraha at some point in their negotiations that Baxter would go forward with the Beraha needle,[3] no best efforts provision was written onto the marked-up counter-proposal during the May 8 meeting. Furthermore, the parties left intact a merger clause stating that the agreement constituted the entire understanding between the parties. Beraha and Chaltiel, on behalf of Baxter, then signed the marked-up counter-proposal.

On May 24, 1984, Paul Flattery sent a letter to Beraha with an attached license agreement. The license agreement incorporated all the handwritten changes that Beraha and Chaltiel had made and initialled on the Baxter counter-proposal at the New Orleans meeting on May 8, 1984. At first Beraha refused to sign the re-typed version of the agreement because it contained no

---

**3.** The precise language that Chaltiel used is in dispute. In his deposition, Chaltiel denied that he used the term "best efforts" but admits that he gave some assurance. Beraha insists that Chaltiel said Baxter would use its best efforts.

Regardless of what the parties said to one another, no best efforts clause appears on the marked-up version of the license agreement. Beraha does not argue that the oral promise should be given effect.

best efforts provision. He telephoned his contacts at Baxter[4] and requested some assurance from Chaltiel concerning the level of effort that Baxter would exert to develop the Beraha needle. During the telephone conversation, Beraha received no representation concerning the specific level of effort that would be made. Nevertheless, reassured by the promise that Chaltiel would send him a letter, on May 29, 1984, Beraha signed the re-typed version of the agreement which did not contain a best efforts clause. Flattery suggested language to Chaltiel to be used in a letter to Beraha.

In June 1984, Beraha visited Baxter's research facilities in connection with the development of Beraha's needle. Chaltiel was not present during Beraha's visit but had a letter dated June 20, 1984 ("Chaltiel letter") hand-delivered to Beraha which read as follows:

> Welcome to Chicago! I want to simply [sic] thank you very much for both the license agreement we recently worked out together when Mike and I visited you in New Orleans, and for your visit today in our Research & Development center to pursue together our new biopsy needle project.
>
> Although we work in an environment that is always subject to changing conditions, you can be assured that our present intent is to do our very best to make this project a success, not only for obvious business reasons but also because such a new product could be a step forward in prostate biopsies.
>
> Again, Dr. Beraha, thank you and welcome here.
>
> /s/
>
> Attch: $50,000.00 advanced royalty check as per our Agreement.

Beraha agrees that the letter reflected what Beraha thought was the intent of the parties insofar as it assured Beraha that Baxter would use its best efforts to make the project a success.

Years passed, yet Baxter still had not fully developed and marketed the Beraha needle. Beraha became dissatisfied with Baxter's inaction. On November 22, 1988, Beraha brought a three-count Complaint against Baxter. Count I alleged that Baxter violated express and implied obligations of good faith and fair dealing in the license agreement, Count II alleged Baxter violated fiduciary obligations to Beraha, and Count III alleged that Baxter fraudulently misrepresented to Beraha that it would aggressively and effectively market the Beraha needle. After Baxter moved for summary judgment, Beraha successfully moved for leave to file an Amended Complaint setting forth additional allegations in Count III. Baxter filed a revised motion for summary judgment on all counts in the Amended Complaint. The district court initially granted summary judgment as to all three counts but later vacated the summary judgment as to Counts I and III because it had mistakenly failed to take into account Beraha's statement of contested facts under local Rule 12(m). The district court found that Beraha's Rule 12 statement presented a disputed factual issue as to whether the Chaltiel letter imposed an express obligation on Baxter "to exploit" the license agreement. Mem.Op. at 2, Aug. 1, 1990.

Baxter filed a renewed motion for summary judgment as to Counts I and III. Subsequently, the district court granted Baxter's motion, reasoning that the language of the Chaltiel letter was too vague and indefinite to be enforceable under Illinois law and that without an enforceable express obligation, there could be no fraudulent misrepresentation as alleged in Count III.

On appeal, Beraha argues that the district court should not have entered sum-

---

**4.** In his deposition, Beraha claims he spoke to *Cannizzaro* about his concern and that Cannizzaro reassured him that he would have Chaltiel provide Beraha with a document that would take care of his fears about the absence of a best efforts clause. In Flattery's deposition, Flattery states that Beraha telephoned *Flattery* and asked for a letter from Chaltiel concerning the level of effort that would be made to develop his needle. Whether Beraha spoke with Flattery or Cannizzaro is not material since both represented Baxter and the description of the conversation is essentially the same in both Flattery's and Beraha's depositions.

mary judgment. First, he contends that the Chaltiel letter was part of the agreement between Baxter and Beraha thus imposing an express obligation on Baxter to exploit the license agreement. Second, he argues that even absent the Chaltiel letter, the license agreement encompassed an implied best efforts provision or an implied covenant of good faith and fair dealing. Assuming these obligations existed, there remained a factual issue as to whether these obligations had been fulfilled.

## II.  Analysis

We review the district court's entry of summary judgment in favor of Baxter *de novo*. In our review, we draw all reasonable inferences in the record in favor of Beraha, the non-moving party, and apply our own interpretation of Illinois law to the undisputed facts. *Belline v. K–Mart Corp.*, 940 F.2d 184, 186 (7th Cir.1991).

### A.  Express Best Efforts Clause

■ The license agreement that Beraha signed with Baxter on May 29, 1984, contains no express best efforts clause, but Beraha attempts to patch the hole with the Chaltiel letter. The Chaltiel letter, however, expresses little more than warm wishes for a bright future, and we agree with the district court that even if the Chaltiel letter constitutes part of the contract, it is too vague to be enforceable.

Beraha correctly points out that Illinois courts have enforced best efforts clauses. In *Muka v. Estate of Muka*, 164 Ill.App.3d 223, 115 Ill.Dec. 262, 517 N.E.2d 673 (1987), for example, Stephen Muka agreed to transfer to Chris Muka $1,000,000 worth of stock provided that Chris worked "reasonably hard & [sic] smart at things in the next year." Stephen Muka's estate argued that the fulfillment of the provision should be judged using a subjective personal satisfaction standard rather than an objective reasonable efforts standard, but the estate did not contend that the provision was too vague to be enforceable. *Id.* 115 Ill.Dec. at 265–66, 517 N.E.2d at 676–77. The court found that the objective standard applied. In *Ralph v. Karr Mfg. Co.*, 20 Ill.App.3d

450, 314 N.E.2d 219 (1974), the plaintiff and defendant had agreed that the plaintiff would use his best efforts to manage and increase the defendant's sales program in exchange for a specified monthly retainer and commission. The defendant did not argue that the best efforts provision failed for vagueness but insisted that the plaintiff could not recover because he had not shown that the defendant's sales increased. The court rejected the defendant's argument. *Id.* 314 N.E.2d at 222–223. While Beraha relies on these cases to show that Illinois courts enforce best efforts clauses, Beraha overestimates their significance. These cases illustrate that Illinois courts have not categorically rejected best efforts clauses as vague and unenforceable. They do not show that a court is bound to enforce any statement a party to a contract makes if the statement contains the word "best."

Other Illinois courts have examined best efforts clauses similar to that in the Chaltiel letter and found that they lacked the required certainty to be enforceable. In *Kraftco Corp. v. Kolbus*, 1 Ill.App.3d 635, 274 N.E.2d 153 (Ill.App.1971), the court determined that the defendant's obligation to use his "best efforts" to sell a product was too indefinite and uncertain to be enforceable. *Id.* at 156. In *Goodman v. Motor Products Corp.*, 9 Ill.App.2d 57, 132 N.E.2d 356 (1956), the court found similar "best efforts" language was too lacking in certainty to be intelligible and enforceable. *Id.* 132 N.E.2d at 363. The courts in both *Kolbus* and *Goodman* relied in part on the best efforts language to find the contracts at issue void for lack of mutuality. Even if mutuality is not an issue, however, the discussion of best efforts language in *Kraftco* and *Goodman* pertains to any analysis of definiteness of terms. *Wald v. Chicago Shippers Ass'n*, 175 Ill.App.3d 607, 125 Ill.Dec. 62, 69, 529 N.E.2d 1138, 1145 (1988). Whether an indefinite term renders a contract void for lack of mutuality or merely vitiates an individual provision in a contract, the question of indefiniteness is the same question of law: Have the parties so indefinitely expressed their intentions that the court cannot enforce their

agreement? *Id.* 125 Ill.Dec. at 69, 529 N.E.2d at 1145. In *Wald*, mutuality was not an issue. The Illinois court relied on *Kraftco* and *Goodman*, however, to hold that a contract provision stating that the defendants would assist in "obtaining the largest possible volume of acceptable freight for [the] consolidation" was obscure and indefinite in meaning as a matter of law because it failed to define clearly the defendants' obligations under the contract. *Id.* 125 Ill.Dec. at 69, 529 N.E.2d at 1145.

■ The Chaltiel letter uses language even less specific than the language held to be vague and unenforceable in *Wald*, *Kraftco* or *Goodman* and provides an insufficient basis for imposing contractual duties on Baxter. Even if we agreed with Beraha that the Chaltiel letter constituted part of his agreement with Baxter,[5] Baxter's statement that it would "do [its] very best to make this project a success" is merely a vague expression of goodwill; it is not an enforceable contractual promise. Statements of an informal character expressing goodwill and hope for association are too vague to be enforceable as contract provisions. *See Titchener v. Avery Coonley School*, 39 Ill.App.3d 871, 350 N.E.2d 502, 507 (1976) (employer stated to employee that "your future is with Avery Coonley and I hope it will be for many years to come." The court found that the statement was too vague to establish a definite and certain promise even if it were admissible to contradict the term of employment written into the contract.).

In sum, the license agreement does not expressly require Baxter to exert any specified level of effort to develop the Beraha needle, and the Chaltiel letter was too vague to overcome this deficiency even if it formed part of the license agreement. Therefore, we must next consider whether

the license agreement contains any implied obligations on the part of Baxter. Beraha asserts two bases for an implied obligation in this case. First, he argues that any exclusive license agreement implies a best efforts clause. Second, he maintains that under Illinois law every contract implies good faith and fair dealing.

## B. Implied Best Efforts Clause

■ To support an implied best efforts clause, Beraha relies on the principle set forth in a case familiar to every first-year law student, Justice Cardozo's *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917). In *Lady Duff–Gordon*, the defendant was a fashion designer who gave a licensee the exclusive right to place the defendant's endorsement on designs of others and to sell and license the defendant's designs. Claiming that the defendant had placed her endorsement on goods without the licensee's knowledge, the licensee sued for breach of contract. The defendant claimed that the contract lacked mutuality and could not be enforced. The court held that where the plaintiff's only source of revenue under the agreement came from the plaintiff's sale of clothes that the defendant designed, the plaintiff had an implied obligation to exploit the defendant's designs. With this implied obligation, the court rectified the lack of mutuality and allowed the plaintiff to maintain a cause of action for breach of contract. *Id.* 118 N.E. at 214–215.

While courts have widely accepted the principle in *Lady Duff–Gordon*, they do not lightly find implied obligations of any kind unless those implied obligations serve to effect the clear intentions of the parties derived from the express terms of the con-

---

**5.** Baxter argues that the Chaltiel letter cannot constitute part of the license agreement because it had not even been written when Beraha signed the agreement in May 1984. Beraha argues that the Chaltiel letter induced him to sign the license agreement and should be considered part of the same transaction as the license agreement. Beraha does not suggest until his reply brief that the Chaltiel letter could constitute a modification of the license agree-

ment. Modification would seem to be the more logical position to advocate, but since Beraha did not raise this argument in his opening brief, he waived it. *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1253 n. 2 (7th Cir. 1989). Moreover, since we determine that the language in the Chaltiel letter is too vague to be enforceable, we need not determine whether the Chaltiel letter constitutes part of the original license agreement or a modification.

tract. *See Fox v. Fox Valley Trotting Club, Inc.,* 8 Ill.2d 571, 134 N.E.2d 806, 810 (1956) (before implying an unexpressed covenant, the court first determined that the covenant was necessary to effect the purpose of the contract as a whole and the intentions of the parties); *W.P. Iverson & Co. v. Dunham Mfg. Co.,* 18 Ill.App.2d 404, 152 N.E.2d 615 (Ill.App.1958) (the express terms of the contract reasonably implied that the sales agent would exercise best efforts to develop the market and sell the principal's product since otherwise the contract failed for lack of mutuality); *Cook–Master v. Nicro Steel Products,* 339 Ill. App. 519, 90 N.E.2d 657, 662 (1950) (the court found an implied obligation to purchase to prevent the contract from failing for lack of mutuality); *Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98, 101 (6th Cir.1990) ("Where it is unnecessary to imply ... an obligation in order to give effect to the terms of the contract, the obligation will not be implied."). Illinois courts have generally used the implied best efforts clause only to prevent a contract from failing for lack of mutuality. In determining whether or not the license agreement contains an implied best efforts clause, we must exercise the same restraint that the Illinois courts have exhibited. We will therefore infer a best efforts clause in the license agreement only if it is necessary to prevent the contract from failing for lack of mutuality or to otherwise achieve the clear intentions of the parties derived from their express agreement.

The Court of Appeals for the Sixth Circuit faced the identical issue in the context of a license agreement in *Permanence. Id.* at 101. In *Permanence,* the plaintiff argued that a license agreement that provided for advance royalties and for periodic royalty payments to the plaintiff implied that the defendant would exert its best efforts to develop the patented process. *Id.* Citing several cases with similar facts, the court found that the substantial advance royalties constituted a key provision in the contract militating against an implied best efforts provision. The court reasoned that an advance royalty clause creates an incentive for the licensee to develop the invention or patented product and protects the licensor from being left at the mercy of the licensee. While the court stated that the advance royalty clause alone may not have persuaded it not to infer a best efforts clause, the merger clause contained in the license agreement further negated the implication of a duty to use best efforts. *Id.* at 102.

We find the reasoning in *Permanence* persuasive, consistent with Illinois law and directly applicable to the present case. Through the New Orleans negotiations, Beraha received an increase from $20,000 to $50,000 advance royalties. At the same time, he turned down minimum royalties but received an increase in royalty payments from three percent to three and a half percent and removed the cap on royalties. Beraha received a larger advance payment and the possibility of substantial royalty payments in exchange for sharing in the risk that the Beraha needle would not succeed. Furthermore, the license agreement contained a merger clause,[6] which further undermines Beraha's attempt to rely on any implied obligations. We therefore decline to provide by implication a best efforts clause that is not needed to effect the expressed intentions of the parties.

It is not necessary for a court to interject a covenant to employ best efforts, a doctrine developed in the context of a lack of mutuality of obligation, into every contract in which there is a grant of exclusive agency. Especially ... when an in-

---

**6.** The merger clause stated as follows:

11.5 This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and shall supersede all previous communications, presentations, understandings and agreements, either oral or written, between the parties or any official or representative thereof with respect to the subject matter of this Agreement. This Agreement may be amended or modified only by a written instrument executed by all of the parties hereto.

ventor grants a license to patented technology, the application of which is unknown, a commitment on the part of the licensee to devote best efforts to the development of the technology is a substantial commitment which should not be automatically inferred.

*Id.* at 103.

## C. Implied Covenant of Good Faith and Fair Dealing

■ Notwithstanding our refusal to find an implied best efforts clause, we must separately address Beraha's argument regarding the implied covenant of good faith and fair dealing. While some cases have muddled the concepts of implied best efforts with the implied covenant of good faith and fair dealing, we find a distinction between the two principles. *Accord Permanence,* 908 F.2d at 100 n. 2. The Illinois courts have stated that every contract implies good faith and fair dealing between the parties to it. *Martindell v. Lake Shore Nat'l Bank,* 15 Ill.2d 272, 154 N.E.2d 683, 690 (1958); *First Nat'l Bank of Cicero v. Sylvester,* 196 Ill.App.3d 902, 144 Ill.Dec. 24, 554 N.E.2d 1063, 1069 (1990), *appeal denied,* 133 Ill.2d 555, 149 Ill.Dec. 320, 561 N.E.2d 690 (1990). However, under Illinois law, the covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract. A lack of good faith does not by itself create a cause of action like a failure to exert best efforts creates when a contract contains an implied best efforts obligation. *Williams v. Jader Fuel Co., Inc.,* 944 F.2d 1388, 1394 (7th Cir.1991); *Anderson v. Burton Associates, Ltd.,* 218 Ill.App.3d 261, 161 Ill.Dec. 72, 578 N.E.2d 199, 203 (1991). Instead, the covenant guides the construction of explicit terms in an agreement.

In *Martindell,* the Illinois Supreme Court announced the principle as follows:

Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which

imputes bad faith to one of the parties and the other does not, the latter construction should be adopted. 12 I.L.P., Contracts, § 217.

*Martindell,* 154 N.E.2d at 690. Cases since *Martindell* have explained that the covenant of good faith and fair dealing limits the exercise of discretion vested in one of the parties to the contract. *Anderson,* 578 N.E.2d at 203; *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 169–70, 466 N.E.2d 958, 971–72 (1984). In *Dayan,* the Illinois Appellate court declined to hold that a franchisor could breach the implied covenant of good faith if he terminated a franchise for good cause but had alternative motives for doing so. The court did observe, however, that the implied covenant of good faith required a franchisor to terminate a franchise only for good cause. *Dayan,* 81 Ill.Dec. at 171–72, 466 N.E.2d at 973–74. In its discussion of the implied good faith and fair dealing doctrine, the court relied on a series of Illinois cases where the contractual obligation of one party was contingent upon a condition peculiarly within the power of that party. The court noted that in such cases, the implied covenant of good faith limits the controlling party's discretion and the controlling party "must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* 81 Ill.Dec. at 170, 466 N.E.2d at 972; *accord Anderson,* 161 Ill.Dec. 72, 578 N.E.2d at 203 (where contract vested no discretion in the defendant, there could be no cause of action based on breach of the implied covenant of good faith and fair dealing); *Foster Enterprises v. Germania Federal Sav.,* 97 Ill.App.3d 22, 52 Ill.Dec. 303, 308–09, 421 N.E.2d 1375, 1380–81 (1981) (where a contract gave a party the discretion to determine whether the market value appraisal was acceptable, the doctrine of good faith required that it reject an appraisal only for satisfactory cause); *Pierce v. MacNeal Memorial Hosp. Ass'n,* 46 Ill.App.3d 42, 4 Ill.Dec. 615, 620–22, 360

N.E.2d 551, 556–58 (1977) (where the effectiveness of a settlement agreement was conditioned on the defendants' receipt of an opinion from the defendants' attorneys, the doctrine of good faith and fair dealing prevented the defendants from avoiding their obligations under the agreement because of their attorneys' inaction); *Dasenbrock v. Interstate Restaurant Corp.*, 7 Ill.App.3d 295, 287 N.E.2d 151, 155–56 (1972) (where a lease stated that no rent would be due until the lessee obtained all the necessary licenses, consents and permits, the court implied an obligation on the part of the lessee to use reasonable efforts to obtain the permits).

■ Like the contracts in the cases cited above, the license agreement in the case before us affords discretion to Baxter which Baxter must exercise reasonably. Pursuant to the license agreement, Baxter obtained an exclusive license to manufacture and sell the needles described in Beraha's pending patent application. In exchange, Baxter gave Beraha $50,000 up front and promised him royalties of three and a half percent of net sales of the needles. Under this provision, Baxter's obligation to pay royalties did not arise unless Baxter developed and sold the Beraha needle. Therefore, the license agreement vested significant discretion in Baxter. Guided by the covenant of good faith and fair dealing, we interpret the contract to require Baxter to exercise reasonably its discretion in developing and marketing the Beraha needle.

Baxter correctly states that in Illinois the obligation of good faith and fair dealing is not a separate obligation upon which a cause of action may be based. Baxter then attempts to analogize this case to several cases where Illinois courts declined to impose a duty based on the doctrine of good faith and fair dealing. Nothing in this opinion, however, conflicts with the principles pronounced in those cases.

Most of the cases that Baxter cites involve employment contracts which present a unique problem. The Illinois courts have found that the covenant of good faith and fair dealing implied in all contracts is equally present in employment contracts. *See, e.g., Criscione v. Sears, Roebuck & Co.*, 66 Ill.App.3d 664, 23 Ill.Dec. 455, 458, 384 N.E.2d 91, 94 (1978) (good faith and fair dealing implied in every contract). On the other hand, Illinois courts have consistently held that "[p]arties to an employment at-will contract may terminate it for a good reason, a bad reason, or no reason at all, ...." *Id.* 23 Ill.Dec. at 459, 384 N.E.2d at 95 (citations omitted); *Zewde v. Elgin Community College*, 601 F.Supp. 1237, 1250 (N.D.Ill.1984) (citing *Cuerton v. Abbott Laboratories, Inc.*, 111 Ill.App.3d 261, 66 Ill.Dec. 906, 910, 443 N.E.2d 1069, 1073 (1982)). These two principles may appear to conflict. However, several federal courts interpreting Illinois law have cogently reasoned that the covenant of good faith, which is a principle of construction, gives way to the rule that an employment at-will contract is terminable for any reason. Otherwise, the employment at-will principle would be meaningless. *Zewde*, 601 F.Supp. at 1250 (citing *Gordon v. Matthew Bender & Co., Inc.*, 562 F.Supp. 1286, 1288–90 (N.D.Ill.1983)); *accord Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927, 931 (N.D.Ill.1985) (termination of an employment at-will contract for any reason does not conflict with the reasonable expectation of the parties and therefore does not breach the implied covenant of good faith).

The reasoning in the employment cases that reject a claim for breach of an implied covenant of good faith and fair dealing comports with the principle articulated in *Dayan:* the implied covenant of good faith and fair dealing requires a party vested with discretion to exercise that discretion reasonably, with proper motive and in a manner *consistent with the reasonable expectations of the parties. Dayan*, 81 Ill. Dec. at 170, 466 N.E.2d at 972. Since Illinois law has consistently held that an employee at-will may be terminated for any reason, an employee at-will has no reasonable expectation that he will be terminated only for cause, and the implied covenant of

good faith and fair dealing cannot require the parties to exceed that reasonable expectation. In short, the employment at-will cases do not reject the covenant of good faith and fair dealing. Rather, they hold that the covenant has not been breached where the employer's actions accord with the reasonable expectations of the parties.

In its attempt to undermine the significance of the implied covenant of good faith, Baxter relies on reasoning in only one case that is not related to an employment contract. In *Bonfield v. AAMCO Transmissions, Inc.,* 717 F.Supp. 589 (N.D.Ill. 1989), the court declined to extend the covenant of good faith and fair dealing to pre-contractual negotiations. The court found that the implied covenant could be used only "to supplement the terms of an *existing* contract, limiting the discretion of the parties in their performance." *Id.* at 593 (citations omitted) (emphasis original). Therefore, in *Bonfield,* as in the employment contract cases that Baxter cites, the court did not disavow the covenant of good faith and fair dealing but explained why it did not apply.

■ In short, although the implied covenant of good faith and fair dealing does not create "an enforceable legal duty to be nice or to behave decently in a general way," *Zick,* 623 F.Supp. 927, 929 (N.D.Ill.1985), it does require Baxter to exercise the discretion afforded to it by the license agreement in a manner consistent with the reasonable expectations of the parties. *Dayan,* 81

Ill.Dec. at 170, 466 N.E.2d at 972. Whether or not Baxter has done so should be determined by the finder of fact.

Asking whether Baxter has exercised its discretion in a manner consistent with the reasonable expectations of Baxter and Beraha may seem indistinguishable from asking whether Baxter has exerted its best efforts to manufacture and market the Beraha needle.[7] A reasonable exercise of discretion, however, does not necessarily require a party to exert its best efforts, particularly where exerting best efforts would require a party to ignore its business judgment. The jury should be allowed to hear the evidence regarding what Baxter did to develop the Beraha needle and then determine if Baxter reasonably exercised its discretion under the circumstances and in light of the reasonable expectations of the parties. Under this approach, the jury could find that Baxter did not breach the contract even if it exerted no efforts at all to develop the Beraha needle if Baxter can show that its decision to exert no effort was reasonable under the circumstances.

### D. Fraudulent Misrepresentation

■ Our decision revives Beraha's claim in Count I but does not affect the district court's summary judgment as to Count III. As the district court noted, Count III, alleging fraudulent misrepresentation, depended on the existence of an express obligation. As the court noted in *Hollymatic Corp. v. Holly Systems, Inc.,* 620 F.Supp. 1366,

7. In *Bonner v. Westbound Records, Inc.,* 76 Ill. App.3d 736, 31 Ill.Dec. 926, 394 N.E.2d 1303 (Ill.App.1979), the Illinois Appellate Court seemed to merge the concept of an implied best efforts clause and an implied covenant of good faith and fair dealing. In *Bonner,* the plaintiffs argued that their publishing and exclusive recording agreement lacked mutuality. The court relied on *Lady Duff-Gordon* (an implied best efforts clause case) as well as *Martindell* (an implied good faith and fair dealing case) and its progeny to find that even absent an advance royalty payment to the plaintiffs and the course of dealing between the parties, an implied best efforts clause would prevent the contract from failing for lack of mutuality. *Id.* 31 Ill.Dec. at 931–33, 394 N.E.2d at 1308–1310. The court also relied on the implied covenant of good

faith and fair dealing to interpret other express provisions of the agreement in a manner consistent with the implied obligation to exert best efforts. Although the court correctly found that an implied best efforts obligation would have saved the contract in the absence of the advance royalty payment or course of dealing, the court's reasoning unnecessarily confused a principle of construction, good faith and fair dealing, with an independent implied obligation, best efforts. To more incisively reach the same conclusion, the court should have first reasoned that the implied best efforts obligation provided mutuality even in the absence of advance royalties and only then turned to the implied covenant of good faith and fair dealing to construe the other provisions of the contract consistent with the implied obligation to exert best efforts.

1369 (N.D.Ill.1985), Illinois does not recognize a cause of action for fraud based on misrepresentations regarding implied obligations. Since we agree with the district court that the Chaltiel letter did not insert an express obligation into the license agreement, we will leave intact the district court's summary judgment in favor of Baxter on Count III. Beraha acknowledged in his brief that Count III would rise or fall with our decision regarding the Chaltiel letter.

### III. Conclusion

For the reasons set forth above, we AFFIRM the district court's judgment as to Count III, but VACATE the district court's judgment as to Count I and REMAND this case to the district court for further proceedings consistent with this opinion.